2007-NMCA-111

169 P.3d 1184

**STATE of New Mexico,
Plaintiff–Appellee,**

v.

**Billy WILSON, Defendant–Appellant.**

**No. 25,966.**

Court of Appeals of New Mexico.

June 29, 2007.

Certiorari Denied, No. 30,570,
Aug. 14, 2007.

Gary K. King, Attorney General, Anita Carlson, Assistant Attorney General, Santa Fe, NM, for Appellee.

John Bigelow, Chief Public Defender, J.K. Theodosia Johnson, Assistant Appellate Defender, Santa Fe, NM, for Appellant.

## OPINION

SUTIN, Chief Judge.

{1} The primary questions in this case relate to *Miranda* issues. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The issues are whether, as the State contends, a court can determine if a defendant is in custody for purposes of requiring *Miranda* warnings (*Miranda* custody) by using the Fourth Amendment dichotomy between an investigatory detention and a de facto arrest, and whether, under the circumstances of this case, Defendant was in *Miranda* custody. We hold that the test for determining that a defendant is in *Miranda* custody is not one employed by using a Fourth Amendment analysis of investigatory detention versus de facto arrest. The test is whether the defendant's freedom of movement is restrained by formal arrest or of the degree associated with a formal arrest. Under this test, we hold that Defendant Billy Wilson was subject to a custodial interrogation, and we reverse the denial of the motion to suppress the statements he made before he was given the *Miranda* warnings while under custodial interrogation.

## BACKGROUND

{2} Officer Phillip Francisco testified that he received a report from dispatch of a possible intoxicated driver attempting to leave a casino parking lot. On the officer's way to the casino, he saw the vehicle that matched the description traveling eastbound on the highway. He saw it pull off the road, lost sight of it for a few seconds, and then the officer pulled in behind it. Defendant and his wife were sitting in the vehicle, in the driveway at their residence. The officer got out of his vehicle and approached Defendant's vehicle. The officer then heard the engine turn off. Defendant's wife got out of the passenger side of the vehicle and started toward the house, and the officer told her to get back in the vehicle. When she did not comply, the officer handcuffed her and had her sit on the sidewalk "to control the situation."

{3} The officer then approached Defendant's vehicle and saw Defendant sitting in the driver's seat. Upon contact with Defendant, the officer detected a strong odor of alcohol and noticed that Defendant had bloodshot and watery eyes, as well as very slurred speech. Defendant repeatedly stated, "This is private property." The officer instructed Defendant to get out of the vehicle. It is unclear from the officer's testimony whether he informed Defendant that the purpose of the investigation was to investigate possible driving while under the influence of alcohol or drugs (DWI). After staying in the vehicle for several minutes, Defendant got out, held onto the vehicle for balance, swayed back and forth, and staggered toward the house. He did not stop when the officer told him to stop. The officer followed Defendant, who turned and faced the officer in a defensive posture with clenched fists, which caused the officer to think that Defendant "was getting ready to fight." The officer began to handcuff Defendant, and with one hand in handcuffs, Defendant pulled away. Because the officer considered this "a defensive move," the officer elected to forcibly put the other handcuff on Defendant, at which time Defendant dropped to his knees. Because Defendant was swaying back and forth more than anyone the officer had ever seen sway, he placed Defendant in the patrol vehicle. The district court questioned the officer as follows.

> THE COURT: ... At the point where you placed [Defendant] ... in the back of your unit ... [w]ere you still investigating the—whether or not a crime had occurred?

[OFFICER]: I was still in the process of investigation. There was still more investigation I wanted to do. At that point, I felt I had enough to arrest him for DWI due to my observation of him.

THE COURT: Did you actually place him under arrest? I mean, did you tell him?

[OFFICER]: Not for—right away. It was after a little bit. Right when I placed him in handcuffs, I didn't tell him that.

{4} After Defendant was placed in the back of the police vehicle, the officer asked Defendant three questions. The first question was whether Defendant "had been driving from the casino," to which Defendant responded, "Yes." The second question was whether Defendant "had been drinking," to which Defendant responded, "Yes." The third question was whether Defendant "would do any field sobriety tests." The officer testified that based on Defendant's demeanor and argumentative nature, the officer did not think Defendant would be able to do the field sobriety tests in a safe manner. Although the officer did not conduct field sobriety tests for safety reasons, he nevertheless asked Defendant if he would perform the field sobriety tests, to which Defendant asserts he responded, "No." The officer had not given Defendant his *Miranda* warnings.

{5} The officer then searched Defendant's vehicle and found an open bottle of beer between the seats. The officer also questioned Defendant's wife. Afterward, the officer arrested Defendant and took him to a detention center, where the officer read the Implied Consent Act, NMSA 1978, §§ 66–8–105 to –112 (1978, as amended through 2005), to Defendant. Defendant refused the breath test.

{6} Defendant was charged by criminal complaint in the magistrate court for the County of San Juan with resisting, evading, or obstructing an officer, contrary to NMSA 1978, § 30–22–1(A) (1981). The complaint stated that Defendant "did: [k]nowingly obstruct, resist or oppose (Deputy Phillip Francisco) [an] officer of this [S]tate ... while (Deputy Francisco) was serving or attempting to serve or execute a process, rule, order or judicial writ of a court of the [S]tate of

New Mexico or any other judicial [ ] writ of process." Defendant was also charged with aggravated DWI, contrary to NMSA 1978, § 66–8–102(D) (2004) (amended 2005), and having an open container in the vehicle. Defendant was convicted by a jury of all three charges. The judgment did not indicate the subsection of Section 30–22–1 of which Defendant was convicted, but the jury instruction was for a violation of Subsection (B) of Section 30–22–1, not Subsection (A).

{7} Defendant appealed to the district court, where a de novo bench trial was held. Defendant moved to suppress the fruits of the stop, arguing that the officer did not have reasonable suspicion to stop Defendant to investigate DWI, and moved to suppress his statements on the ground they were obtained by the officer in violation of *Miranda*. The district court denied the motions, tried the case, and found Defendant guilty of aggravated DWI and resisting an officer. The district court acquitted Defendant on the open container charge.

{8} Defendant appeals, arguing (1) that the court erred in allowing his statements in evidence, in that the statements were obtained without *Miranda* warnings, and (2) that there was insufficient evidence to support a conviction for resisting an officer.

## PRELIMINARY ISSUE—FINAL ORDER

{9} The State asks this Court to dismiss this appeal on the ground that there is no final order. The State points out that the district court did not determine and impose any sentence on Defendant but, instead, remanded the case to the magistrate court "for further proceedings pursuant to the previously entered Judgment and Sentence." The State indicates that were this remand order a remand for imposition of the same sentence previously imposed by the magistrate court, it might be considered final for appeal purposes. However, the State argues that the remand was not for entry of the same judgment and sentence previously imposed because Defendant was not convicted in the district court of the same offenses—that is, in the district court, Defendant was convicted on only two of the three charges of which he was convicted in magistrate court. Further,

the State points out that at the close of trial, the district court indicated that it was remanding for imposition of sentencing and for determination of the extent to which Defendant had to serve any jail sentence. According to the State, this procedure was contrary to NMSA 1978, § 35–13–2(C) (1996), which requires the district court to determine Defendant's sentence.

{10} We see little reason to remand for the district court to clarify what it intended or for a definitive sentence. In our view, with respect to the two crimes of which Defendant was convicted in district court, it intended that Defendant receive the same sentences for those two crimes as was imposed by the magistrate court, and we construe the district court's determination in that manner consistent with *State v. Montoya*, 2005–NMCA–005, ¶¶ 3–5, 136 N.M. 674, 104 P.3d 540, in which the district court remanded to magistrate court for "imposition of the original sentence," and this Court held that to be sufficiently final to permit an appeal. We do not think that this interpretation of what the district court determined runs contrary to our decision in *State v. Cordova*, 114 N.M. 22, 833 P.2d 1203 (Ct.App.1992), where the district court did not impose any sentence.

## DISCUSSION OF MERITS

{11} The parties disagree as to the proper test to apply when determining whether a person is in *Miranda* custody. And they disagree as to whether Defendant actually was in *Miranda* custody. We clarify the proper test, and then address whether Defendant was in *Miranda* custody when he was interrogated. We further discuss harmless error. We also address Defendant's argument that there was insufficient evidence that he resisted, evaded, or obstructed arrest.

### 1. *Miranda* Custody

{12} *Miranda* warnings are required when a person is (1) interrogated while (2) "in custody." *State v. Munoz*, 1998–NMSC–048, ¶¶ 39–40, 126 N.M. 535, 972 P.2d 847. The only *Miranda* element at issue here is whether Defendant was in *Miranda* custody. "Whether a person is subject to custodial interrogation and entitled to

the constitutional protections of *Miranda* is a mixed question of law and fact." *State v. Javier M.*, 2001–NMSC–030, ¶ 17, 131 N.M. 1, 33 P.3d 1. "[F]actual determinations … are subject to a substantial evidence standard of review and application of law to the facts … is subject to de novo review." *Munoz*, 1998–NMSC–048, ¶ 39, 126 N.M. 535, 972 P.2d 847 (internal quotation marks and citation omitted). "We determine whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party." *State v. Bravo*, 2006–NMCA–019, ¶ 5, 139 N.M. 93, 128 P.3d 1070 (alteration omitted) (internal quotation marks and citation omitted).

### a. *Miranda:* The Test for Determining Whether a Defendant Is "In Custody"

{13} Defendant argues that statements he made in the vehicle after he was handcuffed and placed in the vehicle should have been suppressed because the statements were not preceded by *Miranda* warnings. The State argues that *Miranda* warnings were not required because Defendant was not subject to a custodial arrest, but rather an investigatory detention. The State also argues that a stop to investigate drunken driving is generally an investigatory detention and that once Defendant acted in a manner to give the officer reasonable grounds to fear for his safety, the officer was justified in using force to control the situation. The State further argues that as long as the force was reasonable, the stop did not change from an investigatory detention to an arrest and thus *Miranda* warnings were unnecessary.

{14} In determining whether a person is in *Miranda* custody while being interrogated, "the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough v. Alvarado*, 541 U.S. 652, 663, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004) (internal quotation marks and citation omitted); *accord New York v. Quarles*, 467 U.S. 649, 655, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984); *Munoz*, 1998–NMSC–048, ¶ 40, 126 N.M. 535, 972 P.2d 847. Because the test is objective, the actual subjective beliefs

of the defendant and the officer as to whether the defendant is in custody are irrelevant. *Munoz,* 1998–NMSC–048, ¶ 40, 126 N.M. 535, 972 P.2d 847; *Armijo v. State ex rel. Transp. Dep't,* 105 N.M. 771, 773, 737 P.2d 552, 554 (Ct.App.1987). Rather, the "inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty,* 468 U.S. 420, 442, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); *Armijo,* 105 N.M. at 773, 737 P.2d at 554.

{15} Courts have also phrased the test for determining whether interrogation is custodial as whether "a reasonable person [in the defendant's position] would believe that he or she were not free to leave the scene." *Munoz,* 1998–NMSC–048, ¶ 40, 126 N.M. 535, 972 P.2d 847. As several cases have pointed out, this "free-to-leave" formulation of the test is problematic because in some circumstances, such as routine traffic stops, a person is seized and does not believe he or she is free to leave but is also not in custody under *Miranda. See Berkemer,* 468 U.S. at 440–42, 104 S.Ct. 3138 (holding that questions during ordinary traffic stops do not amount to "custodial" interrogation for purposes of *Miranda,* even though the individual is seized and cannot leave); *State v. Sanchez,* 2001–NMCA–109, ¶ 22, 131 N.M. 355, 36 P.3d 446 (same); *Armijo,* 105 N.M. at 773–74, 737 P.2d at 554–55 (same).

{16} The State does not advance the free-to-leave test and in fact argues that the test to determine whether an individual is in custody is not whether the subject is free to leave. Further, relying on *Javier M.,* 2001–NMSC–030, ¶ 19, 131 N.M. 1, 33 P.3d 1, which states that "investigatory detentions do not implicate the Fifth Amendment in the same way as custodial interrogations," the State argues that a person subject to an investigatory detention is not subject to custodial interrogation. We conclude that the State's reliance on *Javier M.* is misplaced.

{17} In *Javier M.,* the defendant was a minor found at the scene of a party in an apartment involving alcohol. *Id.* ¶¶ 2–3. Numerous officers went to the scene and separated the adults from the minors. *Id.* ¶ 2. Then, the defendant was asked to step outside of the apartment and was questioned

by an officer in the stairwell. *Id.* ¶ 3. The defendant admitted drinking alcohol and was cited for being a minor in possession of alcohol. *Id.* The defendant challenged the admission of his statements into evidence, arguing that the officer's failure to give him *Miranda* warnings before interrogating him required suppression of his statements. *Id.* ¶ 5. Our Supreme Court disagreed. *Id.* ¶ 21. While the Court agreed that the defendant was not free to leave, *id.* ¶ 20, the Court distinguished the defendant's situation from a custodial interrogation for many reasons. Some circumstances important to the Court were that there was "nothing in the record to indicate that the [defendant] was overpowered by police presence," the period of detention was short, the defendant was not told that his detention would not be temporary, the detention was not adversarial, and the detention occurred in the presence of ten to fifteen other suspects, rather than in an isolated area. *Id.* ¶¶ 21–23. The Court also stated that "the [defendant] was subject only to an investigatory detention and not custodial interrogation." *Id.* ¶ 20. The Court relied on a discussion in *Berkemer* distinguishing Fourth Amendment investigatory detentions, which are "presumptively temporary and brief," from custodial interrogation under *Miranda. Javier M.,* 2001–NMSC–030, ¶ 19, 131 N.M. 1, 33 P.3d 1. The Court stated, "Because the atmosphere surrounding such investigatory detentions is not so inherently coercive that the detainee feels compelled to speak, 'persons temporarily detained pursuant to such stops are not "in custody" for the purposes of *Miranda.'" Id.* (quoting *Berkemer,* 468 U.S. at 440, 104 S.Ct. 3138).

{18} An investigatory detention occurs when an officer briefly detains and investigates a person based on reasonable suspicion of criminal activity. *See State v. Lovato,* 112 N.M. 517, 519–20, 817 P.2d 251, 253–54 (Ct.App.1991). Such stops are reasonable under the Fourth Amendment. *See Berkemer,* 468 U.S. at 439–40, 104 S.Ct. 3138. An arrest, by contrast, requires probable cause. *Michigan v. Summers,* 452 U.S. 692, 700, 101 S.Ct. 2587, 69 L.Ed.2d 340 (1981). When an officer with reasonable suspicion but without probable cause

detains an individual in an unreasonable manner, the detention may amount to a de facto arrest, rather than an investigatory detention. *State v. Werner*, 117 N.M. 315, 317–18, 871 P.2d 971, 973–74 (1994). Whether a stop is an investigatory detention or a de facto arrest is a question analyzed under the Fourth Amendment reasonableness inquiry. *Id.* at 317, 871 P.2d at 973.

{19} After *Berkemer,* several courts addressed whether *Miranda* warnings are necessary in certain investigatory detentions. *See, e.g., United States v. Newton,* 369 F.3d 659, 669–77 (2d Cir.2004); *United States v. Perdue,* 8 F.3d 1455, 1463–66 (10th Cir.1993); *United States v. Smith,* 3 F.3d 1088, 1096–98 (7th Cir.1993); *Griffin v. United States,* 878 A.2d 1195, 1199 (D.C.2005). As stated in *Perdue,* an investigatory detention, often called a *Terry* stop, "usually involves no more than a very brief detention without the aid of weapons or handcuffs, a few questions relating to identity and the suspicious circumstances, and an atmosphere that is substantially less police dominated than that surrounding the kinds of interrogation at issue in *Miranda.*" *Perdue,* 8 F.3d at 1464 (internal quotation marks and citation omitted). Thus, "[t]he traditional view ... is that *Miranda* warnings are simply not implicated in the context of a valid *Terry* stop." *Id.; see Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, the court in *Perdue* recognized that the trend has been toward a "multifaceted expansion of *Terry* ... granting officers greater latitude in using force in order to 'neutralize' potentially dangerous suspects during an investigatory detention." *Id.* Thus, in the context of the Fourth Amendment, without transforming a seizure from an investigatory detention to a de facto arrest, courts have upheld "the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons, and other measures of force." *Id.; see also Lovato,* 112 N.M. at 522, 817 P.2d at 256 (holding that officers used reasonable force in effectuating an investigatory detention and thus the stop did not amount to an arrest where the officers stopped a vehicle suspected in a recent drive-by shooting and, with guns drawn, ordered the occupants to exit the vehicle with their fingers laced behind their necks, then handcuffed the occupants).

{20} However, in deciding whether a defendant is in *Miranda* custody, the question is not whether he or she is being questioned as a part of an investigatory detention. *Newton,* 369 F.3d at 670–71; *Perdue,* 8 F.3d at 1464–65; *Smith,* 3 F.3d at 1097–98; *see also Quarles,* 467 U.S. at 652, 655, 104 S.Ct. 2626 (holding that the defendant was in custody for *Miranda* purposes where he was chased through a store, surrounded by officers, handcuffed, and questioned). *Miranda* requires that warnings be given when "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda,* 384 U.S. at 444, 86 S.Ct. 1602. The facts in *Miranda,* a station house interrogation, did not necessitate that the Court expound upon the meaning of "otherwise deprived of ... freedom of action in any significant way." *Id.* Since *Miranda,* however, the United States Supreme Court has explained the meaning of those words, stating that the "ultimate inquiry" is whether a reasonable person in the defendant's position would believe that there was "a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *Yarborough,* 541 U.S. at 663, 124 S.Ct. 2140 (internal quotation marks and citation omitted); *accord Berkemer,* 468 U.S. at 440, 104 S.Ct. 3138; *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). As such, in *Berkemer,* the Supreme Court recognized that generally, routine traffic stops do not usually require that the detainee be given *Miranda* warnings before interrogation. *Berkemer,* 468 U.S. at 437–40, 104 S.Ct. 3138. However, the Supreme Court then stated that "[i]f a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." *Id.* at 440, 104 S.Ct. 3138. As stated by the Court in *Perdue,* if police officers "take highly intrusive steps to protect themselves from danger, they must similarly provide protection to their suspects by advising them of

their constitutional rights." *Perdue*, 8 F.3d at 1465.

{21} Although our Supreme Court in *Javier M.* did consider the fact that the defendant was subject only to an investigatory detention in deciding whether the defendant's *Miranda* rights were violated, we do not believe that the Court's decision in *Javier M.* signals a departure from the "ultimate inquiry" required in *Miranda* cases, i.e., whether a reasonable person in the defendant's position would believe that his or her freedom of movement had been restrained to the degree associated with a formal arrest. *Compare Javier M.*, 2001–NMSC–030, ¶ 18, 131 N.M. 1, 33 P.3d 1 (considering whether a defendant is seized under an investigatory detention in deciding if he or she is in custody for purposes of *Miranda* ), *with, e.g., Newton*, 369 F.3d at 673 ("[W]hether [a] stop was permissible under *Terry* . . . is irrelevant to the *Miranda* analysis." (internal quotation marks and citation omitted)). As such, we disagree with the State's view that under *Javier M., Miranda* warnings are never required during an investigatory detention. *See State v. Snell*, 2007–NMCA–113, ¶¶ 13– 14, 142 N.M. 452, 166 P.3d 1106 (2007) (holding that although custodial interrogations do not typically occur at routine traffic stops, "this is not a bright-line rule applying to all traffic investigations, and if a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him in custody for practical purposes, he will be entitled to the . . . protections prescribed by *Miranda*.' " (internal quotation marks and citation omitted)).

{22} As to the State's argument that the test is not whether a reasonable person in the defendant's position would feel free to leave, we do not fully agree. While freedom to leave is not the ultimate inquiry, this consideration is firmly established in the law. *See Javier M.*, 2001–NMSC–030, ¶¶ 18, 20, 131 N.M. 1, 33 P.3d 1 (discussing the lack of freedom to leave and noting other factors relevant to the inquiry into whether a person is in custody); *see also Yarborough*, 541 U.S. at 664–65, 124 S.Ct. 2140 (considering whether a reasonable person would have felt free to leave). Given the difficulty in applying the

free-to-leave analysis, for example, in routine traffic stops where the individual is not free to leave but also not "in custody" pursuant to *Miranda, see Berkemer*, 468 U.S. at 440, 104 S.Ct. 3138, we note that in *Newton*, the court harmonized this inquiry with the inquiry into whether a defendant's freedom of action has been restrained to the degree associated with a formal arrest. *Newton*, 369 F.3d at 672. The court stated that "a free-to-leave inquiry reveals only whether the person questioned was seized." *Id.* As such, if a court first asks whether a reasonable person would believe that he or she was free to leave, and answers in the affirmative, then there cannot be a custodial interrogation under *Miranda. Id.* However, if a court answers negatively, the inquiry does not end, because "not every seizure constitutes custody for purposes of *Miranda*." *Id.* Thus, a court must then ask whether "a reasonable person would have understood his freedom of action to have been curtailed to a degree associated with [a] formal arrest." *Id.* We believe that viewing the free-to-leave inquiry in this light is consistent with the case law relying on the free-to-leave language and ascribes to the free-to-leave inquiry the proper weight in a *Miranda* analysis.

{23} In conclusion, we reiterate that when determining whether an individual is in *Miranda* custody, "the court must apply an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint of freedom of movement of the degree associated with a formal arrest." *Yarborough*, 541 U.S. at 663, 124 S.Ct. 2140 (internal quotation marks and citation omitted).

### b. Defendant Was "In Custody" for the Purpose of a *Miranda* Analysis

{24} In New Mexico, we have no case analyzing whether a suspect who is handcuffed and placed in the back seat of a patrol car is in *Miranda* custody, though several cases outside New Mexico discuss relatively similar circumstances. First, we discuss the New Mexico cases; then we discuss the cases from other jurisdictions.

{25} In *Armijo*, we considered whether a driver stopped pursuant to a routine traffic stop was in custody and thus required *Mi-*

*randa* warnings. *Armijo,* 105 N.M. at 772–74, 737 P.2d at 553–55. The driver of a truck ran a red light and was stopped by an officer. *Id.* at 772, 737 P.2d at 553. The defendant appeared intoxicated and the officer had the defendant complete field sobriety tests, which the defendant failed. *Id.* Afterward, when the defendant was again seated in his truck, another officer asked the defendant if he had been drinking, to which the defendant answered that he had consumed about five beers. *Id.* In addressing the defendant's argument that the officer was required to give him *Miranda* warnings before asking him questions, we compared the temporary lack of freedom to leave during an ordinary traffic stop with "restraints comparable to those associated with a formal arrest." *Armijo,* 105 N.M. at 773, 737 P.2d at 554 (internal quotation marks and citation omitted). We relied upon the fact that during traffic stops the questions are generally routine, the detention is generally brief, and the stops are generally in public view. *Id.* Consistent with *Berkemer,* we held that the noncoercive aspect of ordinary traffic stops and the temporary nature of the detention did not warrant the conclusion that the defendant was in custody during the questioning. *Armijo,* 105 N.M. at 773, 737 P.2d at 554.

{26} Later, our Supreme Court decided *Munoz,* in which the defendant was suspected of murder. *Munoz,* 1998–NMSC–048, ¶ 3, 126 N.M. 535, 972 P.2d 847. In the morning, two federal agents went to the house where defendant lived with his grandfather, apparently woke the defendant, and asked him to go with them to talk about the death of the victim. *Id.* The agents told the defendant, before he got into their vehicle, "that he did not have to go with them, that he did not have to talk to them, that he was not under arrest, that he would be free to leave at any time, and that they would bring him back to his house after the interview." *Id.* ¶ 5. The defendant agreed to go with the agents, who drove to an empty parking lot a few minutes away from the defendant's home. *Id.* ¶¶ 5–6. One agent sat in the back seat with the defendant while he was questioning the defendant, and the other agent sat in the front seat. *Id.* ¶ 7. The interview lasted one hour and forty minutes. *Id.* ¶ 39. Our Supreme

Court recognized that "the location of the interrogation—in a police car—and … the length of the interrogation—one hour and forty minutes—" could lead to the conclusion that the defendant was in custody. *Id.* ¶ 42. However, in answering "the basic question—whether [the d]efendant's freedom of movement was restrained in a way that could be associated with a formal arrest—" the Court concluded that the defendant was not in custody. *Id.* ¶ 43. The facts the Court found significant included that the agents told the defendant that he did not have to go with them or answer their questions, that he was told that he was not under arrest and that he could leave at any time, and that "[t]hey did not handcuff him, nor did they search him." *Id.*

{27} In addition to *Munoz,* two other cases have relied upon the lack of restraints in deciding that a suspect was not in *Miranda* custody. In *State v. Swise,* 100 N.M. 256, 256–58, 669 P.2d 732, 732–34 (1983), our Supreme Court addressed whether a defendant was in custody when officers came to his place of business and interviewed him for seven to ten minutes and when the defendant was at no time "placed under arrest or held in constraint." Given those circumstances, the Court held that the defendant was not deprived of his freedom in any significant way and it could not reach the conclusion that "the defendant's freedom of action was impaired so as to constitute a custodial interrogation." *Id.* at 257–58, 669 P.2d at 733–34.

{28} Similarly, in *Bravo,* 2006–NMCA–019, ¶¶ 1, 11–13, 139 N.M. 93, 128 P.3d 1070, we held that a defendant suspected of child abuse resulting in death was not in custody on either of two occasions she was questioned. The first occasion was after the defendant called 911 and the police responded, questioning her in her home with her children and other family members present. *Id.* ¶ 11. While at one point during the questioning, the officer was sitting between her and the doorway in the dining room, we held that "[h]er movements were not restricted in any way by the officers." *Id.* On the second occasion, the police asked her and her husband to follow them to the police station to be interviewed because some of their prior

statements were inconsistent with what medical personnel told the officers. *Id.* ¶ 12. This interview lasted about two hours, and though the interview happened at the police station, the defendant "never told the officers she was tired [and] was never placed in handcuffs or told she was under arrest." *Id.* ¶ 13. As such, we upheld the district court's determination that the defendant was not in custody during either interrogation. *Id.* ¶¶ 11–13.

{29} Recently, this Court addressed the question of whether a defendant was subjected to a custodial interrogation while seated in the back of a police car. *See Snell,* 2007–NMCA–113, ¶ 11, 142 N.M. 452, 166 P.3d 1106. In *Snell,* the defendant was in a car accident that killed the driver of another vehicle. *Id.* ¶ 3. When a police officer arrived at the scene, he began to question one of the witnesses to the accident. *Id.* ¶ 4. As the officer questioned the witness, the defendant interrupted in an attempt to persuade the officer and the witness that he was not at fault. *Id.* The officer asked the defendant to leave and he was subsequently physically escorted away by another officer, threatened with arrest if he continued to interrupt, and placed in the back seat of a police car. *Id.* The defendant sat in the car with the doors locked and closed until the officer returned and began asking him questions about the accident. *Id.* The defendant then made an incriminating statement that he later sought to have suppressed on the ground that he was not given a *Miranda* warning. *Snell,* 2007–NMCA–113, ¶ 6, 142 N.M. 452, 166 P.3d 1106. On appeal, we agreed with the district court that the defendant "was in custody when he was questioned in the back seat of a police car." *Id.* ¶ 11. In so concluding, we stated that "[t]he conduct of the police . . . in threatening [the d]efendant with arrest, physically escorting him to the police car, placing him in the back seat, where he was locked in, leaving him there, and then returning to question him . . . exerted just the sort of pressure to which *Berkemer* refers." *Id.* ¶ 14.

{30} Cases from other jurisdictions hold that the defendants were in *Miranda* custody under circumstances similar to those in the present case. Two cases from Massachusetts involve both handcuffing the suspect and placing him in a police vehicle. In *Commonwealth v. Damiano,* 422 Mass. 10, 660 N.E.2d 660, 661 (1996), the defendant was apprehended by an officer who had just left the scene of a dead body found in the middle of a highway. When the officer saw the defendant on that cool night, he was barefoot, wearing shorts, and scaling a chainlink fence. *Id.* When the officer approached the defendant, he ran into the middle of a main thoroughfare, waving his arms and yelling, "Don't kill me." *Id.* (internal quotation marks omitted). The defendant told the officer that he was not a real cop and that the defendant wanted to talk to the state police; then he "stated that he had been robbed and that a man had been seriously hurt on the highway." *Id.* The officer struggled with the defendant, handcuffed him, and put him in the police cruiser. *Id.* The officer then took the defendant back to the scene of the body, where the state police were still investigating. *Id.* A state trooper questioned the defendant, without giving him *Miranda* warnings, while the defendant was handcuffed and in the back seat of a police vehicle. *Damiano,* 660 N.E.2d at 661. The Commonwealth of Massachusetts argued that the defendant was in protective custody and that as such, *Miranda* warnings were unnecessary. *Damiano,* 660 N.E.2d at 662. The court stated that whether the defendant was in protective custody was not controlling and that the test was whether, "considering all the circumstances, a reasonable person in the defendant's position would have believed that he was in custody." *Id.* The court held that "[a]s a matter of law no reasonable person" who was "handcuffed in the back seat of a police cruiser in the middle of the night on a multi-lane State highway" would believe that he or she was not in custody. *Id.*

{31} Similarly, in *Commonwealth v. Gordon,* 47 Mass.App.Ct. 825, 716 N.E.2d 1036, 1037–38 (1999), the court held that a defendant who had been chased, forcibly restrained, handcuffed, and put in the back seat of a police vehicle was in custody. The court stated that even though the restraint was reasonable under a *Terry* stop, "the combined indicia of handcuffs and restraint

in the back of a police cruiser attain the level of custody associated with formal arrest" under the reasonable person test required by *Miranda. Gordon,* 716 N.E.2d at 1038.

{32} Several cases have decided that a defendant is in *Miranda* custody when the defendant is handcuffed although not also placed in a police vehicle. After looking at all of the circumstances and after asking whether a reasonable person in the defendant's position would believe that he or she was restrained to the degree associated with a formal arrest, each case held that the defendant was in custody. *Quarles,* 467 U.S. at 655, 104 S.Ct. 2626 (holding that the defendant was in custody where he "was surrounded by at least four police officers and was handcuffed when the questioning at issue took place"); *Newton,* 369 F.3d at 675–76 (holding that the defendant was in custody when he was placed in handcuffs in his home after being told that the handcuffs were used only "to ensure his own safety and that of the officers," even though under the Fourth Amendment there was not a de facto arrest); *Smith,* 3 F.3d at 1096–98 (holding that the defendant was in custody where he was "frisked, placed in handcuffs and told to sit at a specific place on the grass by the side of the road," even though the use of force was reasonable under *Terry); Wright v. State,* 766 N.E.2d 1223, 1230 (Ind.Ct.App.2002) (holding that, where the defendant was handcuffed, he was in custody even though the officer told the defendant that "he was not placing him under arrest ... and that he was only [handcuffing the defendant] for officer safety").

{33} We find *Newton* to be particularly well reasoned and instructive. In *Newton,* the defendant was handcuffed and questioned in his home. 369 F.3d at 663. The officers used handcuffs because they knew he had a gun, and the court held that the use of handcuffs was reasonable and did not result in a de facto arrest under the Fourth Amendment. *Id.* at 663, 675. The officers told the defendant that "he was *not* being placed under arrest and that the restraints were being employed simply to ensure his own safety and that of the officers." *Id.* at 676. Nonetheless, the Second Circuit Court of Appeals held that the defendant was in custody for purposes of *Miranda,* explaining that "a reasonable person would ... have understood that as long as the handcuffs remained in place, his freedom of movement, even within his home, would be restricted to a degree comparable to that of an individual placed under formal arrest." *Newton,* 369 F.3d at 677. In *Newton,* the court stated that "[h]andcuffs are generally recognized as a hallmark of a formal arrest." *Id.* at 676.

{34} Finally, by contrast, in *State v. Gruen,* 218 Wis.2d 581, 582 N.W.2d 728, 733 (App.1998), the court held that the defendant was not in custody for *Miranda* purposes. In *Gruen,* the defendant was stopped by an officer after the defendant was seen walking through the snow away from a crashed vehicle on a cold night, and the officer asked the defendant if he wanted to wait in the officer's police vehicle for other officers from the proper jurisdiction to arrive. 582 N.W.2d at 729–30. The defendant waited in the vehicle without handcuffs and the court construed the conflicting evidence in the light most favorable to the district court's finding. *Id.* at 734. The officers from the proper jurisdiction arrived about fifteen minutes later and asked the defendant questions, with the door to the vehicle open, without giving him *Miranda* warnings. *Gruen,* 582 N.W.2d at 734.

{35} Looking at the facts in the light most favorable to the ruling in the district court, we agree with the State that Defendant was subject to an investigatory detention at the time of the questioning. We also believe that the amount of force used by the officer was reasonable under a Fourth Amendment analysis and did not transform the stop into a de facto arrest. *See Lovato,* 112 N.M. at 522–23, 817 P.2d at 256–57. However, the question before us is whether a reasonable person in Defendant's position would have believed that he was restrained to the degree associated with a formal arrest. *See Newton,* 369 F.3d at 676. We think so. The officer used force in order to fully handcuff Defendant, which caused Defendant to drop to his knees, and then the officer placed Defendant in the back seat of the officer's vehicle. Following *Damiano, Gordon, Quarles, Newton, Smith,*

*Wright,* and *Snell* we conclude as a matter of law that a reasonable person in Defendant's position would believe that he was restrained to the degree associated with a formal arrest. We therefore hold that Defendant was in *Miranda* custody.

## 2. Harmless Error

{36} The State nevertheless argues that if we conclude that the statements were obtained in violation of *Miranda,* the error was harmless. "[O]ur general rule is to review violations of federal constitutional rights under a harmless error standard." *State v. Gutierrez,* 2007–NMSC–033, ¶ 18, 142 N.M. 1, 162 P.3d 156. "The State has the burden of establishing that the constitutional error was harmless beyond a reasonable doubt." *Id.* (internal quotation marks and citation omitted). "Federal constitutional error cannot be deemed harmless if there is a reasonable possibility that the evidence complained of might have contributed to the conviction." *Id.* (internal quotation marks and citation omitted). "While the strength of the properly admitted evidence is a factor in evaluating the likely impact on the jury of the constitutional error, constitutional error cannot be deemed harmless simply because there is overwhelming evidence of [the] defendant's guilt." *Id.* (alteration omitted) (internal quotation marks and citations omitted). "[O]ur harmless error review is not simply a matter of weighing the evidence." *Id.* ¶ 21. "[W]e assess the likely impact of the constitutional violation on the verdict." *Id.; see also State v. Johnson,* 2004–NMSC–029, ¶ 9, 136 N.M. 348, 98 P.3d 998 (stating that the focus is "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction" (internal quotation marks and citation omitted)).

{37} The State asserts that it was uncontroverted that Defendant was intoxicated, including that he smelled of alcohol, had bloodshot eyes and very slurred speech, and swayed while he walked, stood, and kneeled. Further, the State asserts that the officer saw that the vehicle was still running when he approached it. The State argues that this evidence is sufficient for a conviction under

Section 66–8–102(D)(3) without Defendant's admissions.

{38} To convict Defendant under Section 66–8–102(D)(3), the State was required to prove that Defendant operated the vehicle and was "less able to the slightest degree, either mentally or physically, or both, to exercise clear judgment and steady hand necessary to handle a vehicle with safety to the person and the public," and also to prove that Defendant refused to submit to chemical testing. UJI 14–4508 NMRA. The district court stated, in particular, that

> The Court does find that as to the [DWI], I do find beyond a reasonable doubt that Defendant was operating a motor vehicle or in control, due to the testimony.
>
> I do find beyond a reasonable doubt that the Defendant was under the influence of intoxicating liquor; as a result, that he was less able to the slightest degree, whether mentally or physically or both, to exercise the clear judgment and steady hand necessary to handle the vehicle due to the testimony that he smelled of alcohol, due to the fact [he had] bloodshot eyes, due to the testimony of the slurred speech, the swaying as he walked, his lack of control and his behavior during the arrest.
>
> I believe all of those factors and also the admission to consuming alcohol, I believe those show that I think that his judgment was impaired when he contacted the officer. I believe that shows that his judgment was impaired both mentally and physically as he was exercising—as he was driving the vehicle. I do find that the Defendant refused to submit to the chemical testing.
>
> And I do find the Defendant guilty of [DWI]—aggravated [DWI].

{39} In this case, there were no blood or breath alcohol tests or field sobriety tests. Further, while the officer saw Defendant's vehicle on the road and "a few seconds" later saw Defendant sitting in the driver's seat of the running vehicle, the officer did not testify that he saw Defendant driving. While the evidence of intoxication was sufficient to convict Defendant, it was not so "overwhelming" as to require a conclusion beyond a reason-

able doubt that Defendant's statements that he had been drinking, as well as driving, had no impact on the court's conclusion that Defendant's judgment was impaired and thus were harmless. The court expressly added Defendant's "admission to consuming alcohol" to the factors that the court determined showed that Defendant's "judgment was impaired." *See State v. Alvarez–Lopez,* 2004–NMSC–030, ¶ 34, 136 N.M. 309, 98 P.3d 699 (recognizing that "[c]onfessions have profound impact on the jury" (internal quotation marks and citation omitted)); *State v. Ybarra,* 111 N.M. 234, 238, 804 P.2d 1053, 1057 (1990) (holding that the admission of statements obtained without *Miranda* warnings was not harmless where the other evidence of guilt was not overwhelming). Moreover, we cannot say that there is no reasonable possibility that these statements might have contributed to or have affected the court's determination. *See Santa Fe Custom Shutters & Doors, Inc. v. Home Depot U.S.A., Inc.,* 2005–NMCA–051, ¶ 31, 137 N.M. 524, 113 P.3d 347 ("When a district court in its role as gatekeeper *overrules* an objection and admits evidence, it is illogical to presume that the district court in its role as factfinder will disregard evidence that it already has concluded is admissible."); *State v. Gutierrez,* 1996–NMCA–001, ¶ 4, 121 N.M. 191, 909 P.2d 751 ("In a bench trial, the trial court is presumed to have disregarded improper evidence, and erroneous admission of evidence is not reversible error unless it appears the trial court must have relied on it in reaching its decision." (internal quotation marks and citation omitted)). We therefore conclude and hold that admission of the statements was not harmless error.

### 3. Sufficiency of the Evidence

{40} Defendant makes two arguments as to the sufficiency of the evidence of the charge of resisting, evading, or obstructing an officer. The first argument is that he was charged in magistrate court under Section 30–22–1(A), which outlaws resisting an officer who is serving process; whereas, he was convicted on facts that had nothing to do with the service of process. He argues that there was insufficient evidence of the essential element that the officer was serving pro-

cess. The State responds that Defendant was found guilty of Section 30–22–1 generally, without reference to a subsection, and that Subsection (B) was proved. Thus, Defendant's second argument is that there was insufficient evidence that he violated Subsection (B).

In reviewing the sufficiency of the evidence, we must view the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict. The relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. We must not reweigh the evidence or substitute our judgment for the judgment of the [fact-finder]. *State v. Jensen,* 2006–NMSC–045, ¶ 8, 140 N.M. 416, 143 P.3d 178 (alteration omitted) (internal quotation marks, citations, and emphasis omitted).

Resisting, evading or obstructing an officer consists of:

A. knowingly obstructing, resisting or opposing any officer of this state or any other duly authorized person serving or attempting to serve or execute any process or any rule or order of any of the courts of this state or any other judicial writ or process;

B. intentionally fleeing, attempting to evade or evading an officer of this state when the person committing the act of fleeing, attempting to evade or evasion has knowledge that the officer is attempting to apprehend or arrest him[.]

§ 30–22–1. Defendant was convicted in the magistrate court of violating Section 30–22–1, and although the judgment does not indicate any particular subsection, the jury instruction was the instruction for violation of Subsection (B).

{41} Defendant argues that there was not sufficient evidence that he violated Section 30–22–1(A) or (B). Although the State characterizes Defendant's argument as an argument that he did not receive notice of the charges against him, and then proceeds to argue that the issue was not preserved, we

disagree with this characterization. Defendant does not argue on appeal that he did not have notice of the charge against him, but instead argues that the State did not prove an essential element of Section 30–22–1(A). Only one sentence in Defendant's brief in chief could be considered to arguably raise a notice argument, in which Defendant posits that he could not be convicted of a different offense than the offense with which he was charged. However, Defendant does not develop this argument, *see State v. Torres*, 2005–NMCA–070, ¶ 34, 137 N.M. 607, 113 P.3d 877 (stating that we will not address issues unsupported by argument and authority). We recognize that under limited circumstances, informations may be amended. *State v. Roman*, 1998–NMCA–132, ¶¶ 9–15, 125 N.M. 688, 964 P.2d 852 (indicating that we have upheld convictions for new charges not named in the complaint where the defendant did not argue that he did not have notice of the new charge, addressing the circumstances under which new charges may be added, and addressing a due process argument that the defendant lacked notice of a new charge against him); *see also State v. Rojo*, 1999–NMSC–001, ¶ 53, 126 N.M. 438, 971 P.2d 829 ("Where there is a doubtful or deficient record, every presumption must be indulged by the reviewing court in favor of the correctness and regularity of the ... court's judgment." (internal quotation marks and citation omitted)). Thus, without more, we cannot read this single sentence to raise an argument that Defendant lacked notice of the charges against him. Rather, we review the argument clearly set forth in Defendant's brief, that there was not substantial evidence that Defendant violated Section 30–22–1(A) or (B).

{42} We agree with Defendant on his first argument, that the State did not introduce sufficient evidence to affirm his conviction under Subsection (A). *See* § 30–22–1(A); *see also State v. Vargas*, 2007–NMCA–006, ¶ 28 n. 5, 140 N.M. 864, 149 P.3d 961 (indicating that a defendant must know that an officer is serving process under Subsection (A)), *cert. granted*, 2006–NMCERT–012, 141 N.M. 105, 151 P.3d 66. The State introduced no evidence that the officer was serving process or that Defendant knew the officer was serving process.

{43} However, there was sufficient evidence that Defendant resisted, evaded, or obstructed the officer under Subsection (B). The elements of a violation of Subsection (B) are that the officer was one acting in the lawful discharge of duty, that the defendant knew that the officer was attempting to apprehend or arrest him, and that the defendant fled, attempted to evade, or evaded the officer. UJI 14–2215 NMRA; *see also* § 30–22–1(B). The officer testified that when he attempted to handcuff Defendant, Defendant pulled away after only one handcuff was on, and in response, the officer had to forcibly finish handcuffing Defendant, causing Defendant to end up on his knees. Given that the officer had already put one handcuff on Defendant when he pulled away, there is evidence that Defendant had knowledge that the officer was attempting to apprehend or arrest him and that Defendant then attempted to resist or evade the officer by pulling away. Defendant argues that the officer's statement that Defendant started pulling away is conclusory and did not indicate "which arm ... [Defendant] move[d] and where," and thus does not establish sufficient evidence that Defendant resisted arrest. However, we believe that the officer's statement that Defendant pulled away is sufficient. *See Jensen*, 2006–NMSC–045, ¶ 8, 140 N.M. 416, 143 P.3d 178.

**CONCLUSION**

{44} We reverse Defendant's conviction of aggravated DWI based on the use of Defendant's statements obtained in violation of *Miranda*. We affirm Defendant's conviction of resisting, evading, or obstructing an officer. We remand the DWI conviction to the district court for consideration of Defendant's guilt without using his statements that we have required to be suppressed. We remand the resisting, evading, or obstructing conviction to the magistrate court for sentencing on that conviction.

{45} **IT IS SO ORDERED.**

WE CONCUR: LYNN PICKARD and CELIA FOY CASTILLO, Judges.