This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                          **NO. 32,273**

**MERLE EDAAKIE, JR.,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF MCKINLEY COUNTY**
**Grant L. Foutz, District Judge**

Gary K. King, Attorney General
Santa Fe, NM
M. Anne Kelly, Assistant Attorney General
Albuquerque, NM

for Appellee

Law Works L.L.C.
John A. McCall
Albuquerque, NM

for Appellant

**MEMORANDUM OPINION**

**WECHSLER, Judge.**

**{1}** Defendant, Merle Edaakie, Jr., appeals his convictions for second degree murder and tampering with evidence. Defendant argues that the admission of self-implicating statements was reversible error and also challenges the sufficiency of the evidence on which he was convicted. We affirm.

**BACKGROUND**

**{2}** Three detectives visited Defendant at his home in connection with a death resulting from a stabbing that occurred in Gallup, New Mexico. At the time of the visit, Defendant, among others, was a person of interest. The detectives sought to interview Defendant, but lacked probable cause to seek a warrant for Defendant's arrest. One of the detectives gave Defendant a card and asked Defendant to call when he was "in town." Later that afternoon, Defendant drove, unaccompanied and unescorted, to the police station.

**{3}** At the police station, Defendant entered through the front door and was given a standard visitor's pass. A detective who had been alerted to Defendant's presence by a secretary escorted Defendant to the interview room. The interview was recorded on video and, separately, on audio. The camera was positioned above the parties, set at an angle to face into the corner of the room where the discussion took place. A detective seated Defendant in a chair set against the side of a desk between the desk

2

and a wall. Defendant had a small amount of extra space between the wall and his seat. One detective sat at the desk and another sat a few feet in front of Defendant, but at an angle so as to orient himself toward both the detective at the desk and Defendant.

{4} The interview lasted about two hours and forty minutes, with a few breaks in the discussion. Three detectives interviewed Defendant, not more than two at a time. During the course of the interview, Defendant placed himself at the scene of the crime. When detectives confronted Defendant with assertions that there were witnesses who saw him stab the victim and that the victim identified him before dying, Defendant repeatedly denied being the killer. Eventually, Defendant—who seemingly was a member of the Zuni Pueblo—said that his other person, his witch, must have stabbed the victim.

{5} After further questioning, a detective read Defendant his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), and Defendant signed a waiver of those rights. The interview continued for approximately one hour after Defendant signed the *Miranda* waiver, covering much of the same ground. Just after the detective began reading Defendant his *Miranda* rights, Defendant asked if he was being placed in custody and was told that he was not. After the interview, Defendant left.

3

{6} Defendant filed a pre-trial motion to suppress the interview. Subsequent to a hearing, the district court denied Defendant's motion. After trial, a jury convicted Defendant of second degree murder and tampering with evidence.

**ADMISSION OF THE INTERVIEW**

{7} Defendant contends that the interview he gave to police officers was improperly admitted into evidence over his motion to suppress because the interview took place under circumstances that constituted a custodial interrogation and he was not informed of his *Miranda* rights until after he implicated himself. Defendant further argues that even a valid waiver of his *Miranda* rights during the course of the interview does not make his post-waiver self-implicating statements admissible. Defendant's arguments raise a question of the application of the law to the facts, which we review de novo. *State v. Nieto*, 2000-NMSC-031, ¶ 19, 129 N.M. 688, 12 P.3d 442.

{8} The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend V. In accordance with these rights, *Miranda* held that, prior to being made the subject of custodial interrogation, a person "must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." 384 U.S. at 444. The right to *Miranda* warnings are triggered by a combination of two circumstances:

4

warnings are required when a person is (1) interrogated and (2) while in the custody of law enforcement. *State v. Wilson*, 2007-NMCA-111, ¶ 12, 142 N.M. 737, 169 P.3d 1184. The State concedes that Defendant was interrogated; therefore, the *Miranda* issue in this case narrows to whether Defendant was in custody during the interrogation.

{9} A person is in custody if under formal arrest or if the person's freedom of movement is restrained to "the degree associated with a formal arrest." *Stansbury v. California*, 511 U.S. 318, 322 (1994) (internal quotation marks and citation omitted). The test for custody is objective, and in order to determine whether an interrogation is objectively custodial, we look to the totality of the circumstances. *Id.* at 323-24.

{10} Defendant contends that his freedom of movement was restrained to the degree associated with formal arrest. He argues that the following circumstances, in combination, support this legal conclusion: he was "afraid" to come to the police station and speak with the detectives; he was told that there were witnesses who saw him commit the crime and that the victim identified him before dying; he was questioned for an extended length of time; the physical circumstances of the questioning were constraining; and he was not told that he could leave until the end of the interview.

{11} In *State v. Munoz*, 1998-NMSC-048, 126 N.M. 535, 972 P.2d 847, our Supreme Court addressed an interrogation under related circumstances. In *Munoz*, two FBI agents sought out the defendant at his home. *Id.* ¶ 3. The agents told the defendant that they wanted to speak with him about a death, but wanted to do so away from his home. *Id.* ¶ 3. The defendant later testified that he had been scared, but went with the agents because his grandfather urged him to go. *Id.* ¶ 4. Outside of the house, the agents informed the defendant that he was not obligated to speak with them, was not under arrest, and could leave at any time. *Id.* ¶ 5. The agents drove the defendant to an empty parking lot near his home to conduct the interview. *Id.* ¶ 6. The defendant was told by the agents that the essential facts were known and that lying would be a waste of time. *Id.* ¶ 8. The defendant verbally confessed and also signed a handwritten confession. *Id.* ¶ 13. The interview took approximately one hundred minutes. *Id.* ¶ 35. After the interview, the agents drove the defendant home. *Id.* ¶ 15. The defendant testified that he had been intimidated by the location of the interview. *Id.* ¶ 10. The Court found that the defendant was not in custody during the interrogation. *Id.* ¶ 44. The Court relied on facts that the defendant was informed that he was free to leave at any time, was not placed under arrest, was not handcuffed or searched, was not locked in the car or prevented from leaving it, and was taken home by the agents after the interview. *Id.* ¶ 43.

**{12}** *State v. Bravo* is also instructive. In *Bravo*, five police officers went to the home of the defendant. 2006-NMCA-019, ¶ 12, 139 N.M. 93, 128 P.3d 1070. The defendant and her husband were asked whether they would be willing to give a supplemental statement because the police received information inconsistent with their original statements. *Id.* The defendant and her husband agreed and followed the officers to the police station to be interviewed. *Id.* The interview lasted approximately two hours. *Id.* ¶ 13. In holding that the defendant was not in custody, we relied on the facts that the defendant was never placed in handcuffs, was never told that she was under arrest, and did not claim that she was tired. *Id.*

**{13}** *Munoz* and *Bravo* underscore the point that an interrogation in a coercive environment, without more, is insufficient to establish custody. *See Munoz*, 1998-NMSC-048, ¶ 44 (stating that, without formal arrest or restraint on freedom of movement, "a non-custodial situation is not converted to one in which *Miranda* applies simply because . . . the questioning took place in a 'coercive environment'" (internal quotation marks and citation omitted)). In the case before us, Defendant voluntarily went to the police station several hours after he was given the card of one of the detectives who visited his home. Although he argues that he was afraid, he, like the defendant in *Munoz*, chose to talk to the police. *See id.* ¶¶ 43-44 (holding that the defendant was not in custody when, despite being scared, he went and spoke with

7

police voluntarily). Furthermore, the citation to the record provided by Defendant for his having been afraid indicates only that he was afraid to be seen entering the police station, not that he was afraid to speak with the police.

{14} Although Defendant was not told that he was free to go at any time, he arrived under his own power and of his own volition. He entered through the front door and received a visitor's pass. Early in the interview, he was told not to worry that he would be "thrown in [jail]" and that when the interview was over, he would be "free to go." The door to the room where he was interrogated was unlocked and, at least once, he took a break. He was never handcuffed or otherwise physically restrained. He retained possession of his cellphone and, at one point while the detectives were out of the room, appeared to use it. Although Defendant was, like the defendant in *Munoz*, told that the police had evidence against him, detectives never told Defendant that he was being arrested and, when he asked whether he was being taken into custody, he was told that he was not. The interview took place in a small office with Defendant seated in a chair with his back to the wall and the door to the office closed but, under the totality of the circumstances, this set-up is not sufficient to render the interrogation custodial. *See Nieto*, 2000-NMSC-031, ¶ 21 (holding an interrogation non-custodial when it took place in a small office with the door closed and the defendant's back to the wall with an officer between the defendant and the door, given

8

that the defendant agreed to accompany the police to the station, was free to leave, and was provided with transportation to and from the interview). The length of the interview—approximately two hours and forty minutes—is unhelpful to Defendant, who did not complain of being tired. *See Bravo*, 2006-NMCA-019, ¶ 13 (holding that a two-hour interrogation at a police station when the defendant did not complain of being tired was non-custodial). After the interview, Defendant left to go to work. Despite the inherently coercive environment of a police station interview room, the totality of the circumstances do not indicate that Defendant's freedom of movement was restrained in a way associated with formal arrest. Defendant was never in custody, and a *Miranda* warning was not required.

{15} We agree with Defendant that a valid waiver of his *Miranda* rights in the middle of a custodial interrogation would not be sufficient to render admissible even that portion of his statement made after the waiver. *See Missouri v. Seibert*, 542 U.S. 600, 611 (2004) (holding unconstitutional the tactic of custodial interrogation without issuing a *Miranda* warning and then, upon receiving implicating information, issuing the warning and then repeating the question to obtain the information under waiver of *Miranda* rights). However, because Defendant was never in custody, a *Miranda* waiver was not required.

**SUFFICIENCY OF THE *MIRANDA* WARNING**

9

{16}    Defendant argues that because he was only advised during the course of his interview that a lawyer would be appointed for him if he could not afford one and not, specifically, that the appointed lawyer would be free of charge, the *Miranda* warning was insufficient.  Because Defendant was not in custody and a *Miranda* warning was therefore not required, we decline to consider this argument.

**SUFFICIENCY OF THE EVIDENCE**

{17}    Defendant contends that he was convicted on the basis of insufficient evidence. He argues that the evidence was merely circumstantial and relied heavily on Defendant's "unusual and ambiguous" statements to police.  A challenge to the sufficiency of the evidence is reviewed under the substantial evidence standard. *State v. Sutphin*, 1988-NMSC-031, ¶ 21, 107 N.M. 126, 753 P.2d 1314.  When reviewing a conviction, "we resolve all disputed facts in favor of the State, indulge all reasonable inferences in support of the verdict, and disregard all evidence and inferences to the contrary."  *State v. Rojo*, 1999-NMSC-001, ¶ 19, 126 N.M. 438, 971 P.2d 829.  Substantial evidence is that which, after viewing the evidence deferentially in favor of the verdict, a rational jury could have found the essential elements of the crime beyond a reasonable doubt. *Id.*

{18}    It is undisputed that the victim was stabbed to death.  The State presented evidence from Defendant and others that he was at the scene of the crime.  Defendant

knew that the victim was in an apartment with a woman he thought to be his girlfriend. Defendant admits that he banged on the door angrily and tried to break a window. Defendant denied stabbing the victim, but when the police told him that there were witnesses to the stabbing, Defendant told them that it must have been his other person, his witch. Defendant also claimed that he dreamed of blood and that he already knew of the killing when he received text messages about it the following morning. Viewed as a whole and in the light most favorable to the State, this evidence is sufficient to support the jury's verdict that Defendant killed the victim. *See id.* ¶ 23 (stating that circumstantial evidence can be substantial evidence and that the elements of the evidence are viewed in combination when measured for support of the verdict).

**CONCLUSION**

{19}     For the foregoing reasons, we affirm the judgment of the district court.

{20}     **IT IS SO ORDERED.**


_____
**JAMES J. WECHSLER, Judge**


**WE CONCUR:**


_____
**MICHAEL D. BUSTAMANTE, Judge**

11

_____

**LINDA M. VANZI, Judge**