2006-NMCA-019

128 P.3d 1070

**STATE of New Mexico,**
**Plaintiff–Appellee,**

v.

**Elisa BRAVO, Defendant–Appellant.**

**No. 23992.**

Court of Appeals of New Mexico.

Dec. 8, 2005.

Patricia A. Madrid, Attorney General, Katherine Zinn, Assistant Attorney General, Santa Fe, for Appellee.

John Bigelow, Chief Public Defender, Nancy M. Hewitt, Assistant Appellate Defender, Santa Fe, for Appellant.

## OPINION

WECHSLER, J.

{1} Defendant Elisa Bravo appeals her conviction for child abuse resulting in the death of her four-year-old son, Rodrigo, in violation of NMSA 1978, § 30–6–1 (1997) (amended 2005). On appeal, Defendant argues that, because she was in custody but had not been given *Miranda* warnings, the district court erred in admitting into evidence two incriminating statements she made to police. She argues that a third statement she made to police was also admitted in error because she had invoked her right to an attorney but had not been provided one. Finally, Defendant appeals the district court's classification of her crime as a "serious violent offense" under the Earned Meritorious Deduction Act (EMDA), NMSA 1978, § 33–2–34(L)(4)(n) (1999) (amended 2004), arguing that the classification violated *Blakely v. Washington*, 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Because Defendant was not in custody during the first two interviews and did not clearly invoke her right to counsel at the time of the third interview, and because the district court's classification did not violate *Blakely* or *Apprendi*, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

{2} On July 12, 2001, police and emergency medical personnel responded to Defendant's home because Defendant called 911 to report that her four-year-old son, Rodrigo, had been injured and was unconscious. Officer Steven Barnett of the Las Cruces Police Department was the first to arrive at Defendant's home. Upon his arrival, Defendant allowed Officer Barnett into her residence and into one of the back bedrooms of her home. Officer Barnett saw a small boy on the bed. The boy, Defendant's son, Rodrigo, was dressed only in his underwear and socks and seemed to be having trouble breathing. His eyes were partially open and "starting to roll up into the top of his [head]." Officer Barnett also noticed that Rodrigo had a bruise on his chin. Shortly thereafter, emergency personnel arrived, followed by Defendant's husband, Vidal Bravo. Officer Barnett asked Defendant, who was in the bedroom along with her three young daughters, to vacate the bedroom so that the emergency personnel could work on Rodrigo. Officer Barnett was assisted by one of the fire department personnel in communicating

with Defendant because Defendant spoke primarily Spanish.

{3} Officer Barnett requested that the Dona Ana Sheriff's Department respond to the scene when he realized that Defendant's home was outside Las Cruces Police Department jurisdiction. Deputy Allen Franzoy and Investigator Craig Buckingham, along with at least one other Dona Ana sheriff, arrived soon after. Officer Trivizo of the Las Cruces Police Department also arrived to assist in Spanish/English translation. Mr. Bravo left with the emergency personnel and accompanied Rodrigo to the hospital.

{4} Defendant, accompanied by her three daughters and other family members who had arrived at the house, remained at her home at the request of police. Defendant was then interviewed by Investigator Buckingham with Officer Trivizo serving as an interpreter. Investigator Buckingham questioned Defendant in the dining room of her home regarding the cause of Rodrigo's injuries. He and the remaining officers left after the interview without arresting Defendant. Police officers interviewed Defendant on July 16 and again on July 17, 2001, after her arrest. She was charged with intentional child abuse resulting in death and tampering with evidence. Defendant filed three motions to suppress incriminating statements she made on July 12, 16, and 17. The district court denied her motions. We discuss the remaining facts as they pertain to the particular issues on appeal.

## STANDARD OF REVIEW

{5} In reviewing a district court's ruling on a motion to suppress, "we observe the distinction between factual determinations which are subject to a substantial evidence standard of review and application of law to the facts[,] which is subject to de novo review." *State v. Nieto,* 2000–NMSC–031, ¶ 19, 129 N.M. 688, 12 P.3d 442 (alteration in original) (internal quotation marks and citation omitted); *see State v. Munoz,* 1998–NMSC–048, ¶ 39, 126 N.M. 535, 972 P.2d 847. "[W]e determine whether the law was correctly applied to the facts, viewing the facts in the light most favorable to the prevailing party." *State v. Joe,* 2003–NMCA–071, ¶ 6, 133 N.M. 741, 69 P.3d 251. We "defer to the

district court with respect to findings of historical fact so long as they are supported by substantial evidence." *State v. Jason L.,* 2000–NMSC–018, ¶ 10, 129 N.M. 119, 2 P.3d 856. We will indulge in all reasonable inferences in support of the district court's ruling and disregard all evidence and inferences to the contrary. *Id.* In addition, we review de novo the issue of whether the district court correctly applied the EMDA during sentencing. *State v. Young,* 2004–NMSC–015, ¶ 11, 135 N.M. 458, 90 P.3d 477 (stating that the interpretation of a statute is an issue of law subject to de novo review).

## JULY 12 AND JULY 16 STATEMENTS

{6} Defendant argues that the district court erred in denying her motions to suppress evidence obtained during police questioning on July 12 and July 16, 2001. Defendant argues that she was "in custody" on both occasions, which required the questioning officers to advise Defendant of her rights pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), prior to questioning her. We find our Supreme Court's opinion in *Munoz* instructive in deciding these issues.

{7} In *Munoz,* two FBI agents went to the defendant's home in order to question him regarding his involvement in the stabbing death of the victim. *Munoz,* 1998–NMSC–048, ¶¶ 2–3. The defendant's grandfather answered the door and retrieved the defendant, who appeared to have recently been sleeping. *Id.* ¶ 3. The FBI agents introduced themselves and informed the defendant that they wanted to talk to him about the victim's death, but not at the defendant's home. *Id.* The defendant stated that he was afraid of the agents, yet accompanied them because his grandfather told him to do so. *Id.* ¶ 4. Once outside the defendant's home, the agents informed the defendant that he was not obligated to speak with them, that he was not under arrest, and that he could leave at any time. *Id.* ¶ 5. The agents did not inform the defendant that he could, or should, have an attorney present. *Id.* The defendant told the agents that he did not mind speaking with them and consented to being interviewed. *Id.* One of the agents

reiterated that the defendant was not obligated to accompany them and that he was not in custody. *Id.*

{8} The agents drove the defendant to a parking lot near the defendant's home. *Id.* ¶ 6. One agent drove the vehicle, while the other was seated in the back seat with the defendant. *Id.* ¶ 7. For a third time, prior to interviewing the defendant, one of the agents informed him that the interview would only be conducted "on a voluntary basis." *Id.* ¶ 6. During the course of the interview, the defendant ultimately confessed to stabbing and killing the victim, and then concealing the body. *Id.* ¶ 11. The defendant signed a handwritten confession, after making corrections, and initialed each page. *Id.* ¶ 13. After obtaining the confession, the agents allowed the defendant to return to his home. *Id.* ¶ 15.

{9} Our Supreme Court held that even though the defendant was interrogated by the FBI agents, the defendant's *Miranda* rights were not violated because the interrogation was not custodial. *Id.* ¶¶ 40, 44. In making this determination, the Court made it clear that one's subjective belief is irrelevant. *Id.* ¶ 40. It stated that "[a] suspect is . . . considered in custody if a reasonable person would believe that he or she were not free to leave the scene." *Id.* It stated that factors in determining whether a reasonable person would believe he or she is free to leave include "the purpose, place, and length of interrogation" in addition to "the extent to which the defendant is confronted with evidence of guilt, the physical surroundings of the interrogation, the duration of the detention, and the degree of pressure applied to the defendant." *Id.*

{10} Applying these factors, the Court in *Munoz* stated that the record did not support a finding that a reasonable person in the defendant's position would have felt that his or her freedom was restrained in a way that could be associated with a formal arrest. *Id.* ¶ 43. Some of the facts relied upon by the Court were that the defendant was informed that he was not under arrest and that he could leave at any time, that he was never handcuffed or searched, that there was no evidence that the car doors were locked, and

that he was free to go home at the conclusion of the interview. *Id.*

■ {11} With regard to the interview conducted by police of Defendant on July 12, 2001, the State's position that Defendant was not in custody, and therefore not entitled to *Miranda* warnings, is even stronger than in *Munoz.* As we have already stated, we must view the facts in the light most favorable to the prevailing party, in this case, the State. *Joe,* 2003–NMCA–071, ¶ 6. The district court found that Defendant was questioned in the familiar surroundings of the dining room of her own home, by police officers who responded to her 911 call. The questioning took place with Defendant's children and family members still in the home. Defendant expressed a willingness to speak with Investigator Buckingham. Defendant mentioned a desire to go see her son, who had just been taken in an ambulance to the hospital, but agreed to remain for a short time to speak with Investigator Buckingham. Her movements were not restricted in any way by the officers. On the contrary, after the interview, Defendant accompanied the officers throughout the house while explaining her side of the events surrounding Rodrigo's injuries. After interviewing Defendant, the officers left her residence. As in *Munoz,* the fact that Investigator Buckingham and Officer Trivizo questioned Defendant in the dining room while sitting between her and the doorway is not, by itself, enough to make Defendant's interview custodial. *See Munoz,* 1998–NMSC–048, ¶¶ 42–43 (stating that the fact that the defendant was questioned while he was sitting in the back seat of an FBI vehicle was insufficient in itself to lead to a conclusion that the defendant was in custody). Substantial evidence supports the district court's finding that Defendant was not in custody when she was interviewed on July 12, 2001.

■ {12} For similar reasons, Defendant also was not in custody when she was interviewed a second time by police, at the Dona Ana police station on July 16, 2001. On July 16, Sergeant Ed Miranda and Investigator John Ordunez, along with three other officers, went to Defendant's home and asked whether Defendant and her husband would

be willing to give another statement. The police officers wanted to speak with Defendant and her husband because they had received information from medical personnel that was inconsistent with the statements Defendant made on July 12. Defendant and her husband agreed to be interviewed and followed the officers to the police station in their own personal vehicle. They stated that they did so because they did not know where the police station was located.

{13} The interview lasted approximately two hours. The district court found that Defendant never told the officers she was tired. She was never placed in handcuffs or told she was under arrest. During the course of the interview, Defendant essentially confessed to the crime charged. Like the defendant in *Munoz*, despite her confession, Defendant was allowed to go home with her husband at the conclusion of the interview. *See id.* ¶ 43; *see also Nieto*, 2000–NMSC–031, ¶ 21 (holding that the fact that the defendant's interrogation took place in a police station, without more, is insufficient for a finding that the defendant was in custody). Given this record, substantial evidence supports the district court's finding that Defendant was not in custody, and therefore was not entitled to *Miranda* warnings, on July 16, 2001.

## JULY 17 CONFESSION

{14} Defendant argues that she did not waive her right to counsel prior to giving a confession on July 17. She contends that she invoked her right to counsel and that Investigator John Ordunez did not afford her her right.

{15} Defendant had been formally arrested and taken to the police station. The district court found that Investigator Ordunez "carefully read the *Miranda* warnings to Defendant in Spanish." After reciting the warning, he asked Defendant if she still wanted to talk to him and she replied "Yes." As a further precaution, Investigator Ordunez asked Defendant to read the advice of rights card to him in Spanish. When Defendant reached the sentence that indicated that she did not want a lawyer, Defendant stated, "I can ask for an attorney here?" Investigator Ordunez explained that she could have a

lawyer if she wanted one. But because she had just waived her right to a lawyer, he explained that she did not need one to talk with him at that time and that a lawyer could be appointed later. Defendant responded "Okay" and continued reading in Spanish from the card: "I do not want a lawyer. I understand and know what I am doing. No promises or threats have been made to me, and no pressure of any kind had been used against me." Investigator Ordunez then asked Defendant if what she had just read was "true and correct" to which she responded in the affirmative. Defendant then signed and dated the waiver.

{16} The invocation of the right to counsel "requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney." *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 129 L.Ed.2d 362 (1994) (internal quotation marks and citation omitted). An ambiguous statement is insufficient. *Id.; see State v. Castillo–Sanchez*, 1999–NMCA–085, ¶¶ 15–17, 127 N.M. 540, 984 P.2d 787. In *State v. Barrera*, 2001–NMSC–014, 130 N.M. 227, 22 P.3d 1177, our Supreme Court stated:

> Resolution of whether a valid waiver of counsel has occurred depends upon the totality of the circumstances and the particular facts surrounding each case, including consideration of the mental and physical condition, background, experience and conduct of the accused.

*Id.* ¶ 28 (internal quotation marks and citation omitted). In that case, based on the totality of the circumstances, the Court reasoned that the defendant knowingly and validly waived his right to counsel despite asking the police "[d]o I need an attorney?" *Id.* ¶ 31. The Court reached its decision by relying in part on *Davis*, 512 U.S. at 462, 114 S.Ct. 2350, in which the United States Supreme Court held that a defendant who had stated "[m]aybe I should talk to a lawyer" had not made a clear, unequivocal request for an attorney requiring officers to cease questioning him. The United States Supreme Court stated in *Davis* that although the fact that the defendant only spoke Spanish could increase the potential for ambiguity, "the

primary protection ... is the *Miranda* warnings themselves." *Davis,* 512 U.S. at 460, 114 S.Ct. 2350.

■ {17} The same is true in this case. The waiver was provided to Defendant in her primary language, Spanish. Defendant read the *Miranda* waiver out loud and stated that she understood it. Under the totality of the circumstances, Defendant's query: "I can ask for an attorney here?" is at best ambiguous. She did not ask for a lawyer, and her question appears to inquire whether she could ask for a lawyer if she wanted one. With this ambiguity, Investigator Ordunez could not reasonably understand that Defendant was invoking her right to counsel. *See Davis,* 512 U.S. at 459–60, 114 S.Ct. 2350. He was not required to either clarify Defendant's request or cease questioning until counsel was provided. *See Barrera,* 2001–NMSC–014, ¶ 31.

{18} Defendant also argues, relying primarily on the recent United States Supreme Court's decision in *Missouri v. Seibert,* 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), that the district court erred in not suppressing the confession she gave police on July 17, 2001. But this case is not like *Seibert.* In *Seibert,* the Court dealt with the police tactic of "question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once.'" *Id.* at 606, 124 S.Ct. 2601. The Court stated that confessions obtained by use of this "question-first" technique violated the defendant's constitutional rights because the technique rendered *Miranda* warnings "ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 611, 124 S.Ct. 2601.

{19} In this case, viewing the facts in the light most favorable to the State, the record does not indicate that police employed the tactic proscribed by the Supreme Court in *Seibert.* Defendant gave a tape-recorded statement on July 17. Defendant testified that she was questioned by police prior to the activation of the tape recorder for approximately ten minutes. However, Investigator Buckingham stated that there was no portion of Defendant's July 17 interrogation that went unrecorded. In addition, with regard to Defendant's statements concerning the events of July 16, the district court indicated that "her testimony ... [was] not credible." Viewing the facts in the light most favorable to the State, we must infer that the district court found Defendant's assertion that the police interrogated prior to turning on the recorder not credible. *See State v. Urioste,* 2002–NMSC–023, ¶ 6, 132 N.M. 592, 52 P.3d 964 (stating that an appellate court should "not sit as a trier of fact; the district court is in the best position to resolve questions of fact and to evaluate the credibility of witnesses"). Moreover, there was no need for the police to resort to the tactics described in *Seibert* because, as previously stated, Defendant had already confessed to the crime on July 16. With this foundation in the record, we have no basis to conclude that Defendant's July 17 confession was improper under *Seibert.*

## EMDA CLASSIFICATION

{20} Finally, Defendant argues, relying on *Blakely* and *Apprendi,* that the district court erred in classifying Defendant's crime as a "serious violent offense" under the EMDA. *See* § 33–2–34(A)(1) (stating that the maximum meritorious deduction for a prisoner confined for having committed a "serious violent offense" is four days per month); § 33–2–34(L)(4)(n) (allowing the sentencing judge the discretion to classify first degree child abuse as a "serious violent offense"). Defendant argues that the issue of whether her crime was a "serious violent offense" should have been submitted to a jury and proven beyond a reasonable doubt. Defendant acknowledges that we have already addressed this precise issue in *State v. Montoya,* 2005–NMCA–078, 137 N.M. 713, 114 P.3d 393. However, Defendant argues, relying on *State v. Franklin,* 78 N.M. 127, 428 P.2d 982 (1967), and *State v. Boyer,* 103 N.M. 655, 712 P.2d 1 (Ct.App.1985), that *Montoya* was wrongly decided. We decline Defendant's invitation to reconsider our holding in *Montoya* and we apply our rationale in *Montoya* to this case.

{21} In *Montoya,* we stated that the United States Supreme Court in *Apprendi* was primarily concerned with "sentences beyond the 'statutory maximum' or 'maximum

sentence[s]' imposed by the judge not based solely on the facts found by the jury or admitted by the defendant," not minimum sentences. *Montoya,* 2005–NMCA–078, ¶ 13 (alteration in original) (citation omitted). Therefore, we held that "the factors that the EMDA allows the judge to find in order to limit credit under Section 33–2–34(L)(4)(n) do not have to be found by the jury beyond a reasonable doubt" because the EMDA does not increase the maximum sentence allowed by statute. *Montoya,* 2005–NMCA–078, ¶ 15.

 {22} In this case, Defendant pleaded no contest to the offense of intentional child abuse resulting in death, as charged in the jury indictment. She was sentenced to serve a period of incarceration not to exceed sixteen years. The maximum sentence allowed by statute is eighteen years. *See* § 30–6–1(F) (classifying intentional child abuse which results in the death of the child as a first degree felony); NMSA 1978, § 31–18–15(A)(1) (1999) (amended 2005) (stating that the maximum sentence for a first degree felony is eighteen years). Defendant's sentence was within the statutory maximum. In addition, the grand jury indictment, to which Defendant pleaded no contest, charged Defendant with causing Rodrigo's death by throwing or slamming Rodrigo's head into a wall, in addition to shaking, torturing, cruelly confining, or cruelly punishing him. Based on this record, we cannot conclude that the district court erred in classifying Defendant's acts as a "serious violent offense" under the EMDA.

## CONCLUSION

{23} The district court did not err in denying Defendant's motions to suppress evidence. In addition, the district court did not err in classifying Defendant's crime as a "serious violent offense" under the EMDA. Therefore, we affirm Defendant's conviction.

{24} **IT IS SO ORDERED.**

BUSTAMANTE, C.J. and PICKARD, J., concur.