This memorandum opinion was not selected for publication in the New Mexico Appellate Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

## IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.                                                    **No. A-1-CA-35384**

**TRAVIS SILVER,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF SAN JUAN COUNTY**
**Karen L. Townsend, District Judge**

Hector H. Balderas, Attorney General
Maris Veidemanis, Assistant Attorney General
Santa Fe, NM

for Appellee

Bennett J. Baur, Chief Public Defender
Allison H. Jaramillo, Assistant Appellate Defender
Santa Fe, NM

for Appellant

**MEMORANDUM OPINION**

**KIEHNE, Judge.**

1

**{1}** Defendant, Travis Silver, had a months-long sexual relationship with his minor stepdaughter. A jury found him guilty of two counts of Criminal Sexual Penetration of a Minor (CSPM) in the first degree (child under thirteen), in violation of NMSA 1978, Section 30-9-11(D)(1) (2009), and two counts of CSPM in the fourth degree (child thirteen to sixteen), in violation of Section 30-9-11(G)(1). On appeal, Defendant contends that (1) the district court erred by not suppressing his confession to police, (2) the district court improperly instructed the jury, and (3) his counsel was ineffective. We affirm.

**BACKGROUND**

**{2}** Defendant, age 29, was stepfather to several of his wife's children, including the victim, S.G. In August 2013, Defendant began a sexual relationship with S.G. who was then twelve years old. Defendant continued to have sex with S.G. until May 2014 when she was thirteen years old.

**{3}** In May 2014, Detective Justin Rieker of the San Juan County Sheriff's Department learned of the sexual relationship between S.G. and Defendant and obtained a warrant for Defendant's arrest. Detective Rieker then telephoned Defendant and asked to interview him about the matter. Defendant maintained that during this telephone conversation, he asked Detective Rieker whether charges were pending

2

against him, and that if so, he wanted to talk to a lawyer. According to Defendant, Detective Rieker told him that no charges were pending. Defendant responded that if no charges were pending, there was no need for them to talk, to which Detective Rieker answered that if Defendant would not come to meet with him, he would go to Defendant. According to Detective Rieker, Defendant never requested a lawyer, but he could not remember whether Defendant asked if charges were pending. Detective Rieker admitted that during this telephone conversation he did not disclose that he had already obtained a warrant for Defendant's arrest.

{4}     Defendant and Detective Rieker agreed to meet at a park in Farmington that afternoon, where Defendant sat in the front seat of Detective Rieker's patrol vehicle. At the outset of the interview, which was audio-recorded, Detective Rieker told Defendant that he was free to go at any time and also read Defendant his *Miranda* rights. However, because Detective Rieker had already obtained an arrest warrant, he actually had no intention of allowing Defendant to leave. Defendant said he was willing to talk, and while Detective Rieker asked Defendant questions about his relationship with S.G., he accused Defendant of having a sexual relationship with her. Defendant steadfastly maintained that his relationship with S.G. was strictly a father-daughter relationship and denied ever having sex with her. After about thirty-five

3

minutes, Detective Rieker decided that the interview was going nowhere and arrested Defendant. Without any additional questioning, Defendant volunteered to tell Detective Rieker everything. For over an hour, Defendant confessed to his sexual relationship with S.G. Defendant said that he knew that his confession would probably get him a long prison term, but explained that he had decided to confess because S.G. was the love of his life and he did not want to deny his love for her.

{5}    Defendant was charged with several counts of CSPM. Before trial, he moved to suppress his confession. After hearing testimony and argument, the district court denied the motion. During a two-day jury trial S.G. testified that she and Defendant had repeatedly engaged in sexual intercourse; her little brother, X.C., testified that on one occasion he had seen Defendant lying on top of S.G. "going back and forth"; and a redacted version of the recording of Defendant's interview with Detective Rieker was played for the jury (the recording was redacted to remove references to Defendant's previous time in prison). The jury found Defendant guilty of two counts of CSPM involving a minor under the age of thirteen, and two counts of CSPM involving a minor between thirteen and sixteen years of age. After trial, the State requested a habitual offender sentencing enhancement, and the district court imposed a sentence of thirty-five and a half years in prison and required Defendant to register

as a sex offender for life. This appeal followed. We will discuss additional facts as they pertain to each of the claims that Defendant raises.

## DISCUSSION

### I.      Suppression of Defendant's confession

{6}      Defendant makes three arguments in support of his assertion that the district court erred in denying his motion to suppress his confession: (A) that his *Miranda* rights were violated, (B) that his confession was not voluntary, and (C) that the statement was obtained in violation of his constitutional right to counsel. We address each argument in turn.

### A.      Defendant's *Miranda* rights were not violated

{7}      Defendant contends that the district court erred by failing to suppress his confession, arguing that his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966) and *Edwards v. Arizona*, 451 U.S. 477 (1981) were violated because (1) Detective Rieker failed to respect his invocation of his right to counsel, and (2) he should have been re-*Mirandized* upon arrest. We are unpersuaded.

### 1.      Standard of review

{8}      "Before statements obtained during a custodial interrogation may be introduced at trial, the State must demonstrate a knowing, intelligent, and voluntary waiver of

5

constitutional rights by a preponderance of the evidence." *State v. Gutierrez*, 2011-NMSC-024, ¶ 7, 150 N.M. 232, 258 P.3d 1024 (internal quotation marks and citation omitted). "On appeal of a district court's decision to deny a motion to suppress inculpatory statements," we review de novo the question of "whether a valid waiver of *Miranda* rights has occurred[.]" *Id.* (alteration, internal quotation marks, and citation omitted). "We will indulge in all reasonable inferences in support of the district court's ruling and disregard all evidence and inferences to the contrary." *State v. Bravo*, 2006-NMCA-019, ¶ 5, 139 N.M. 93, 128 P.3d 1070.

**2.    The district court properly rejected Defendant's claim that Detective Rieker failed to respect his invocation of his right to counsel**

{9}     Defendant claims that when Detective Rieker telephoned him to ask for an interview he invoked his right to have counsel with him during any interrogation, but that when they met later that afternoon at a park, Detective Rieker asked Defendant questions anyway despite the absence of any lawyer. Defendant contends that Detective Rieker therefore violated the rule in *Edwards* by not scrupulously respecting his invocation of his right to counsel.

{10}    But as Defendant acknowledges, there was conflicting testimony on this point at the suppression hearing. Defendant testified that he told Detective Rieker that if charges were pending, he would not answer questions without counsel. Detective

6

Rieker testified, however, that Defendant never asked for counsel. The district court denied the motion to suppress. Although the district court made no specific findings of fact, we review the evidence in the light most favorable to its decision. *Bravo*, 2006-NMCA-019, ¶ 5. The district court was free to accept Detective Rieker's testimony on this point and to reject Defendant's, and we will not second-guess the district court's credibility determination.

{11} Even if the district court had credited Defendant's testimony, we agree with the State that any invocation of his *Miranda/Edwards* right to counsel during his telephone conversation with Detective Rieker was ineffective because he was not then in custody. "We . . . note that the Fifth Amendment right to counsel safeguarded by *Miranda* cannot be invoked when a suspect is not in custody, even if in anticipation of future custodial interrogation." *State v. Desnoyers*, 2002-NMSC-031, ¶ 22, 132 N.M. 756, 55 P.3d 968 (alteration, internal quotation marks, and citation omitted), *abrogated on other grounds by State v. Forbes*, 2005-NMSC-027, ¶ 6, 138 N.M. 264, 119 P.3d 144. *See McNeil v. Wisconsin*, 501 U.S. 171, 182 n. 3 (1991) ("We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than 'custodial interrogation[.]' . . . . Most rights must be asserted when the government seeks to take the action they protect against.").

7

## 3.     Detective Rieker was not required to re-*Mirandize* Defendant

{12}     Defendant's next claim is that the district court should have suppressed his confession because police did not re-read his *Miranda* rights to him when he was formally arrested. Defendant relies primarily on *State v. Bradshaw*, 457 S.E.2d 456, 457 (W.Va. 1995), in which the Supreme Court of Appeals of West Virginia adopted a per se rule "that where police have given *Miranda* warnings outside the context of custodial interrogation, these warnings must be repeated once custodial interrogation begins." Defendant argues that New Mexico should adopt the same rule.

{13}     Defendant's argument, however, fails to acknowledge that our Supreme Court has rejected any such categorical rule. In *State v. Gilbert*, 1982-NMSC-095, 98 N.M. 530, 650 P.2d 814, the defendant was arrested at 4:30 a.m. following an incident involving gunshots fired at a store and was advised of his *Miranda* rights. *Gilbert*, 1982-NMSC-095, ¶ 2. Later that morning, police began to suspect that the defendant might have been involved in the murder of a couple and, at 10:30 a.m., they advised the defendant again of his *Miranda* rights. *Gilbert*, 1982-NMSC-095, ¶ 2. When the defendant realized that he was being questioned about the murders he invoked his right to counsel. All questioning ceased and the defendant called a lawyer, who advised him to say nothing to police. *Id.* Later, police learned that the defendant's wife

8

had also been found dead, and they told the defendant that "the ballgame is up." *Id.* (internal quotation marks omitted). The defendant said that he would talk with police after an hour, and when police arrived an hour later at 2:30 p.m., they began questioning him but did not re-read his *Miranda* rights to him. *Gilbert*, 1982-NMSC-095, ¶ 2. During that conversation, the defendant said that he should probably talk to a lawyer and was provided a telephone should he wish to do so, but he decided not to call the lawyer and during the ensuing conversation he confessed to murdering his wife and several other people. *Id.*

{14} After being convicted of the murders, the defendant appealed, arguing that his confession should have been suppressed because his *Miranda* rights were not re-read to him at the 2:30 p.m. interview. *Gilbert*, 1982-NMSC-095, ¶ 12. Our Supreme Court rejected this claim, holding that "[a] confession is not necessarily invalid because warnings as to the right to remain silent and to counsel were not given in full each time the interrogation process was resumed after interruption." *Id.* The Supreme Court explained that "although defendant was not read *Miranda* rights immediately before being questioned about the death of his wife, he was aware of such rights[]" because the *Miranda* warnings were read to him "on two occasions earlier in the day, as recently as four hours before." *Gilbert*, 1982-NMSC-095, ¶ 12. The Supreme Court

9

noted that the defendant was plainly aware of his right to talk to a lawyer and held that his decision to confess "can only be interpreted as an intelligent act done with sufficient awareness of the relevant circumstances and likely consequences." *Id.* ¶ 14. Since then, our Supreme Court has not retreated from its holding in *Gilbert*. *See State v. Earley*, No. S-1-SC-35356, dec. ¶¶ 21-23 (N.M. Sup. Ct. May 19, 2016) (non-precedential) (citing *Gilbert* and holding that the district court properly declined to suppress a confession, although police did not re-read *Miranda* rights to the defendant before he confessed to the crime, where police had read *Miranda* rights to him one and a half hours earlier).

{15}     We have followed our Supreme Court's approach. In *State v. Quiñones*, 2011-NMCA-018, 149 N.M. 294, 248 P.3d 336, we explained that "[a]lthough we recognize that in certain circumstances officers have re-*Mirandized* suspects during subsequent interrogations, this Court has never adopted a per se rule requiring officers to do so." *Id.* ¶ 12 (emphasis added). We said that "the critical inquiry is whether a suspect is still aware of the rights afforded to him under *Miranda* when he resumes contact with officers." *Quiñones*, 2011-NMCA-018, ¶ 12. In *Quiñones*, we held that the defendant "was still aware of his constitutional rights under *Miranda*" when he resumed contact with police "a few hours" after police read his *Miranda* rights to him. *Quiñones*, 2011-

10

NMCA-018, ¶ 13.

{16}    In this case, Defendant was aware of his *Miranda* rights. Detective Rieker read the *Miranda* rights to Defendant at the beginning of the interview, when Defendant was not yet under arrest. For about thirty-five minutes, Detective Rieker questioned Defendant about his relationship with S.G., and Defendant denied having sex with her. Detective Rieker then arrested Defendant but did not re-read the *Miranda* rights to him. Shortly after his arrest, Defendant said he was willing to talk and spent more than an hour confessing to his sexual relationship with S.G. Not even forty minutes had passed between the reading of Defendant's *Miranda* rights and the start of his confession to police, far less time than had elapsed in *Gilbert*, *Earley*, and *Quiñones*.

{17}    Defendant also argues that, despite these precedents, formal arrest is such a coercive change of circumstances that police should have been required to re-*Mirandize* him. No *Miranda* violation can occur in the absence of custodial interrogation. *See Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (emphasizing that "the special procedural safeguards outlined in *Miranda* are required not where a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation"). Here, when Defendant was formally arrested, Detective Rieker did not initiate questioning; rather, Defendant volunteered to give a statement. There was

11

no *Miranda* violation because Defendant's confession was not made in response to a custodial interrogation.

## B.      Defendant's confession was not involuntary

{18}     Defendant also claims that his confession should have been suppressed as involuntary because Detective Rieker lied to him about whether charges had been filed, did not disclose that he had already obtained an arrest warrant for Defendant, and because Detective Rieker asked Defendant to provide a"justification" of his relationship with S.G., thus falsely implying that Defendant might be able to avoid or reduce criminal charges if he confessed. We reject these claims.

### 1.      Standard of review

{19}     We review the voluntariness of a confession de novo. *State v. Evans*, 2009-NMSC-027, ¶ 32, 146 N.M. 319, 210 P.3d 216. "Voluntariness means freedom from official coercion." *State v. Sanders*, 2000-NMSC-032, ¶ 6, 129 N.M. 728, 13 P.3d 460 (internal quotation marks and citations omitted). "On a claim that police coerced a statement, the prosecution bears the burden of proving by a preponderance of the evidence that a defendant's statement was voluntary." *Evans*, 2009-NMSC-027, ¶ 34. "[W]e review the entire record and the circumstances under which the statement or confession was made in order to make an independent determination of whether a

12

defendant's confession was voluntary." *State v. Fekete*, 1995-NMSC-049, ¶ 34, 120 N.M. 290, 901 P.2d 708. "[T]he preponderance of the evidence must establish that the confession was not extracted from an accused through fear, coercion, hope of reward or other improper inducements." *State v. Cooper*, 1997-NMSC-058, ¶ 30, 124 N.M. 277, 949 P.2d 660 (internal quotation marks and citation omitted).

**2.     The officer's purported statement about no pending charges did not render the confession involuntary**

{20}     Defendant testified that he asked Detective Rieker whether charges had been filed and that Detective Rieker told him they had not. Detective Rieker, however, testified that he could not remember whether Defendant asked that question. Again, it was the district court's sole prerogative to accept or reject Defendant's testimony, and under our standard of review we must assume that the district court rejected it. *See Bravo*, 2006-NMCA-019, ¶ 5. This claim therefore presents no issue for our review.

**3. The officer's non-disclosure of the existence of an arrest warrant did not render the confession involuntary**

{21}     Defendant's argument that the confession was involuntary because Detective Rieker did not disclose that he had already obtained a warrant for Defendant's arrest also fails. Defendant cites no authority for the proposition that a police officer's failure to disclose the existence of an arrest warrant renders a suspect's confession involuntary, and we therefore assume that no such authority exists. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("We assume where arguments in briefs are unsupported by cited authority, counsel after diligent search, was unable to find any supporting authority."). In any event, at the time Defendant admitted to having a sexual relationship with S.G., he was already under arrest, so telling him about the arrest warrant at that point would not have affected the voluntariness of his confession.

**4. The officer's attempts to persuade Defendant to justify his sexual relationship with S.G. did not render his confession involuntary**

{22}     Defendant's final argument is that his confession was involuntary because when Detective Rieker asked him for a "justification" of his sexual relationship with S.G., he tricked Defendant into thinking that he could avoid or reduce criminal charges if he established that the sexual relationship with S.G. was consensual. From a review

of the recording of the interview, it is unclear whether Detective Rieker was attempting to deceive Defendant or simply trying to persuade him to explain how his relationship with S.G. started. Assuming, without deciding, that Detective Rieker intended to trick Defendant into thinking that he could offer a legal "justification" for having sex with S.G., this claim fails because Defendant was not deceived, as the interview itself demonstrates.

{23}    At an early stage of the interview, Detective Rieker pressed Defendant to admit his sexual relationship with S.G.:

> Rieker:    You know, . . . I'm going to shoot straight with you. Okay, . . . sometimes people have relationships with people that are younger than them. Okay? And I think that's the case here. Okay? I think that you and [S.G.] . . . have had a relationship.

> Defendant:  [Inaudible].

> Rieker:    Okay. But listen. Hang on. Listen to me, okay? I need . . . your side of it. I need . . . you to paint a picture . . . that isn't this, you know, this monster, you know what I mean? Because what I have now—Hey, listen—I'm just going to shoot straight with you. I know that you guys have been intimate together. Okay? But I just need to know—just listen, okay?—I just need to know to what extent. Okay? And did you care about her? You know what I mean? Because that's what I need from you. I need . . . some justification as to why that happened.

> Defendant:  Like, what do you mean, what do you mean by intimate? I

15

don't get what you mean by intimate.

{24}    Detective Rieker then asked whether Defendant and S.G. had kissed on the lips or had sex. Defendant denied that they had done so. Detective Rieker then told Defendant that he knew differently and asked whether Defendant would be willing to tell the truth. Detective Rieker then said:

Rieker:    What I need from you is an understanding of what happened, why it happened. So if I get your side of the story—because it's not, it's not a matter of it didn't happen, okay? As soon as we can get past that—and I'm not trying to BS you, okay—as soon as we can get past that and say yes, it did happen, but *why* did it happen? We can, we can provide some light and some justification . . . .

Defendant: See, that's what I don't get. That's what they're saying, but nothing never did happen.

Rieker:    Travis, I'm going to tell you it did happen. Okay? A hundred percent. Okay? Just look at me. I'm not . . . trying to BS you. A hundred percent. Okay? Listen. A hundred percent, I know, I know that it did happen. Okay? But I'm trying to get . . .

Defendant: Why would you say you know it did happen? How would you . . .

Rieker:    Because I have, . . . I've got enough information that it did.

Defendant: Ummm? What? From who and from where?

Rieker:    Well, you're gonna have to trust me on that one, okay?

16

Defendant: But I don't trust you. See that's what everybody's saying. And I don't—that's one thing I know that didn't happen, you know what I mean? And that's what I'm trying to tell you guys. That's what I've been trying to tell everybody. See, I don't get how, how this came about. . . . I'm even wondering why is [S.G.] saying this?

{25} Detective Rieker told Defendant that S.G. was not the only one who said they've been touched by him. Defendant continued to deny touching his stepchildren in any inappropriate way. Detective Rieker continued:

Rieker: Well, . . . here's what we're running into, okay? I've got enough to show—okay, hear me out before you make your statement, okay? I've got enough to show that something did happen at Motel 6. . . . Here's the hardest part. Here's the hardest part right here. The hardest part is to get over the fact that you think that it's wrong and tell me exactly what happened.

. . . .

Defendant: What do you mean?

. . . .

Rieker: A lot of times people will have relationships with people who are younger, and by the law, that says that it's wrong. But you two may have a relationship that you can't—that we can't explain. You know what I mean? But you can. Okay? And with you saying, no, nothing ever happened, when I know that it did, it tells me that you are ashamed of this relationship, and that you have something to hide. As opposed to justifying and telling me why it happened.

17

> . . . .
>
> Defendant: I know exactly what you're saying, but what I'm trying to tell you is that nothing did happen. You know that's what I'm trying to tell you guys—is that nothing did happen.

{26}  Defendant continued to deny any wrongdoing, and said he could not explain why others were accusing him. Defendant continued to deny ever having been sexually intimate with S.G. Detective Rieker resumed:

> Rieker: The reason I'm talking with you is not to bullshit you . . . it's to give you the opportunity to tell me—I know you're not telling me the truth. . . . I don't know if you're ashamed of it. I don't know if maybe you really do care about [S.G.] but just can't justify it in your head. . . . But I also think, if you care about [S.G.], is she lying?
>
> Defendant: That had to been it. Or either that, or her mom's influencing her. . . . That is completely not true.

{27}  Detective Rieker then asked questions about the places where Defendant and his wife lived, and when he separated from her. After more questions along this line, Defendant again expressed bafflement at the accusations against him. Detective Rieker again attempted to persuade Defendant to confess, and Defendant continued to stand his ground:

> Rieker: If we can, . . . if we could cut through all the bullshit, we can get down to the truth, okay? Because, I'm not . . . blowing smoke up your ass. I'm not doing anything like that, okay? I'm telling you straight out, okay, I *know* that

18

> you guys have been intimate. . . . I need you to try to justify why it happened.
>
> Defendant: No, we weren't intimate. That's the thing. We weren't intimate. . . .
>
> . . . .
>
> Rieker: I know that something happened. Okay? And your lack of . . . your ability to tell me says that you're hiding it because you think it's wrong.
>
> . . . .
>
> Defendant: I think what you're trying to have me do—
>
> Rieker: —is tell me the truth. . . . Don't mistake that. All I'm looking for is the truth.
>
> Defendant: Okay, I'm trying to tell you my side of the truth.
>
> . . . .
>
> Rieker: I know what really happened inside that motel room.
>
> . . . .
>
> Defendant: That's what you believe. . . . You're not even trying to listen to what I'm saying, like, I'm trying to tell you that nothing happened. . .

{28}     Defendant continued to deny ever having sex with S.G. Detective Rieker then arguably tried to persuade Defendant that there was a legal justification for having sex with S.G., but Defendant was unpersuaded:

19

Rieker: Well, you know, I just . . . I don't want you to be painted as this monster. 'Cause, let me tell you my honest opinion. You know where I stand. I know that you did it . . .

Defendant: That's what you think.

. . . .

Rieker: We're going to differ on that, and that's okay. . . . But I don't want you to be painted as this monster who took advantage of this young lady, and, you know, put his own free will on her and just did what he wanted with her. You could be this guy that decided to have consensual sex with a consenting partner, okay? You can be that guy, or you can be this guy who took it from her.

Defendant: A guy who's sleeping with a young girl, that's, and in a court of law that just doesn't look right upon it so either way. You're trying—

Rieker: —they're two different, they're two different things—

Defendant: You're trying to, you're trying to make me feel like it's okay to admit to this or something—

Rieker: They're two different things.

Defendant: Uh huh . . . I don't get what you're trying to have me do here, but I'm trying to tell you that nothing happened. That's what I'm trying to tell you.

{29} Detective Rieker then decided to end the interview and arrest Defendant. After

20

arresting Defendant, he placed him in the patrol car, and Defendant volunteered to tell him everything. Defendant then spent over an hour confessing to his sexual relationship with S.G.

{30}     Defendant's confession demonstrates that he did not decide to talk because Detective Rieker had deceived him about the legal consequences of his sexual relationship with S.G., but rather because he felt that S.G. was the love of his life and he did not want to deny his love for her, despite his awareness of the adverse legal consequences of doing so. Defendant described how the relationship began with kissing and hand-holding and soon progressed to sexual intercourse. Defendant repeatedly stated that he was aware that he should not be having a sexual relationship with S.G. Defendant also said, "I know what the fuck I'm doing; I'm digging a hole for myself, but at the time I didn't feel like it was wrong. . . . We were a couple."Defendant was aware that he faced significant prison time: (confessing is "going to cost me a lot; I'm looking at a fucking lot of years"), ("Man, I'm going away for a long time"), and that by confessing "I'm signing my own . . . death warrant." Defendant said "I know it's wrong in the law's eyes, but I don't regret it," and at one point even calculated aloud the likely prison term that he might face, including a habitual criminal enhancement. He explained that he had decided to

21

confess because S.G. was the love of his life, and he did not want to deny his love for her.

**{31}** We are convinced that Defendant did not confess because he was deceived about the consequences of doing so. To the contrary, Defendant was well aware that by confessing to having sex with his minor stepdaughter he was bringing serious legal consequences on himself, but he decided to do so anyway for reasons of his own. Defendant's confession was not involuntary.

**C.  Defendant's right to counsel did not attach when police obtained the arrest warrant or when they arrested him**

**{32}** Citing *State v. Franklin*, 1967-NMSC-151, 78 N.M. 127, 428 P.2d 982, and *State v. Boyer*, 1985-NMCA-029, 103 N.M. 655, 712 P.2d 1, Defendant argues that his Sixth Amendment right to counsel attached once a warrant was issued for his arrest and therefore police violated his right to counsel by questioning him in the absence of his lawyer.

**{33}** The Sixth Amendment to the United States Constitution provides that: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." A defendant's Sixth Amendment right to counsel "ordinarily attaches when judicial proceedings have been initiated, by way of formal charge, preliminary hearing, indictment, information, or arraignment." *See Kirby v. Illinois*,

406 U.S. 682, 689 (1972) (plurality opinion) (noting that the right to counsel attaches when government begins "adversary judicial criminal proceedings"); *see also State v. Aragon*, 1990-NMCA-001, ¶ 10, 109 N.M. 632, 788 P.2d 932 (right to counsel "ordinarily attaches when judicial proceedings have been initiated, by way of formal charge, preliminary hearing, indictment, information, or arraignment"). The United States Supreme Court has never held that the right to counsel attaches at arrest. *See United States v. Gouveia*, 467 U.S. 180, 190 (1984) (commenting that "we have never held that the right to counsel attaches at the time of arrest"). And this Court has rejected claims that the right to counsel attaches before the initiation of judicial proceedings by prosecutors. *See, e.g.*, *State v. Kanikaynar*, 1997-NMCA-036, ¶ 14, 123 N.M. 283, 939 P.2d 1091 ("Without question, the right to counsel guaranteed by the sixth amendment to the United States Constitution does not attach until formal charges are initiated." (internal quotation marks and citation omitted)); *see also State v. Sandoval*, 1984-NMCA-053, ¶ 14, 101 N.M. 399, 683 P.2d 516 (rejecting a claim that right to counsel attached when police issued citation after arresting defendants for driving while intoxicated: "A bright line must be drawn between the authority invested in the State's law enforcement officers and that invested in the State's prosecutors.").

23

**{34}** Here, Defendant's interview occurred on May 16, 2014, and the criminal information against Defendant was not filed until May 30, 2014. Therefore, the Sixth Amendment right to counsel had not attached at the time Defendant confessed. Defendant cites numerous authorities in support of his claim to the contrary, but none stand for the proposition that the Sixth Amendment right to counsel attaches when an arrest warrant issues or when an arrest occurs.

## II.    Instructions

**{35}** Defendant's next claim is that the district court failed to give an appropriate supplemental instruction when the jury indicated, during its deliberations, that it was confused by certain erroneous instructions. We conclude that although the district court's instruction was erroneous, it was harmless error, and that Defendant waived his claim that a supplemental instruction should have been given.

**{36}** "We review the validity of jury instructions de novo." *State v. Tafoya*, 2010-NMCA-010, ¶ 40, 147 N.M. 602, 227 P.3d 92. "This Court reviews jury instructions as a whole to determine whether they provide a correct statement of the law." *Id.* ¶ 45.

**{37}** During the jury instruction conference, the parties discussed how to instruct the jury on the elements of the four CSPM counts charged against Defendant. The State's instructions were based on UJI 14-957 NMRA (CSPM of a child under age thirteen)

24

and UJI 14-962 NMRA (CSPM of a child between the ages of thirteen and sixteen), and the State proposed that the jury be instructed that to convict Defendant on each count, it must find, among other things, that Defendant committed the act of criminal sexual penetration in one of two alternative ways:

> The defendant caused [S.G.] to engage in sexual intercourse,
>
> -or-
>
> The defendant caused the insertion, to any extent, of his penis into the vagina of [S.G.]

Defense counsel objected on the ground that the first alternative should not only say "sexual intercourse," but should also include "anal intercourse," "cunnilingus," and "fellatio." Defendant did not object to inclusion of the second alternative. The State argued, and the district court ruled, that the State's proposed instructions would be given because they more accurately reflected the evidence at trial.

{38}   After the jury began deliberating, it sent the following question to the Court:

> Under instruction #1, element #1 states "or", so if we are in agreement on one of the criteria, does that mean disregarding the other element? Because in instruction #1, it states "You must consider these instructions as a whole. You <u>must</u> not pick out one instruction or parts of an instruction [and] disregard others." To us, the "or" makes it sound that we can pick one or the other, [b]ut the instructions state, you must not pick [and] choose.
>
> The question is, can we pick one or the other, or must we come to

agreement on both?

Although the first sentence of this question refers to "instruction #1, element #1," we conclude it refers to the first element of Instructions 3, 4, 5, and 6. The second sentence refers to "instruction #1," which is more accurate, because Instruction No. 1 explained to the jury, among other things, that: "You must consider these instructions as a whole. You must not pick out one instruction or parts of an instruction and disregard others."

{39}     The district court asked the State and Defendant for proposals on how to answer the jury's question. The State argued that the jury did not have to agree unanimously on either alternative formulation of that element as long as the jury unanimously agreed that the first element was satisfied, and asked that the jury be so instructed. Defendant objected to the State's proposal, and said that while it appeared that the jury might be asking about the first element of instructions 3, 4, 5, and 6, he was unwilling to speculate on what the jury might be asking. The district court said that it would simply instruct the jury that it must rely on the instructions already given, and defense counsel did not object to that. The district court sent back a note to the jury which read "You must rely on the instructions as given."

{40}     Now, on appeal, Defendant argues, for the first time, that "[b]y including two

different theories of criminal liability in one jury instruction, the trial court confused the jury as evidenced by its note[,]" and then "failed to remedy the jury's confusion, telling it instead to rely on the same set of contradictory instructions." According to Defendant, he was prejudiced because the jury "likely found [him] guilty without coming to a unanimous agreement" on the way in which Defendant committed criminal sexual penetration.

{41}      We conclude that it was error for the district court to include two alternative formulations for the element of CSPM in its instructions, but that this error was harmless. We addressed the same issue in *Tafoya*, in which we observed that Section 30-9-11(A) defines "criminal sexual penetration" in two ways: (1) as "causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse"; or as (2) "the causing of penetration, to any extent and with any object, of the genital or anal openings of another[.]" Section 30-9-11(A). *See Tafoya*, 2010-NMCA-010, ¶ 44. These two methods of committing criminal sexual penetration are reflected in the uniform jury instruction for CSPM of a child under age thirteen, UJI 14-957, and the instruction for CSPM of a child between the ages of thirteen and sixteen by a person eighteen years or older, UJI 14-962. In each UJI, the first alternative is:

> The defendant [caused _____ (*name of victim*) to engage in _____;][.]

27

Use Note 3 states that in the blank space the district court should "[n]ame the sexual act or acts: i.e., 'sexual intercourse', 'anal intercourse', 'cunnilingus' or 'fellatio' " at issue, followed by the "applicable definition or definitions" from UJI 14-982 NMRA. The second alternative is:

> The defendant [caused the insertion, to any extent, of a _____ into the _____ of _____ (*name of victim*);][.]"

Use Note 4 states that the first blank in this instruction is to be used to "[i]dentify the object used."

{42} In *Tafoya*, we held that the second alternative should only be used where the defendant uses some "object" other than a penis to accomplish the penetration. 2010-NMCA-010, ¶ 44. ("We agree with [the d]efendant that an 'object' would be something other than a penis as that term is used in Section 30-9-11(A)."). That is because the first alternative already addresses situations in which a defendant causes a victim to engage in "[s]exual intercourse," which is defined in UJI 14-982 as "the penetration of the vulva or vagina, the female sex organ, by the penis, the male sex organ, to any extent." *Tafoya*, 2010-NMCA-010, ¶ 44. Accordingly, the district court erred by instructing the jury on the second alternative: *i.e.*, that Defendant committed CSPM if he "caused the insertion, to any extent, of his penis into the vagina of [S.G.]"

{43} This error, however, was not prejudicial, because both alternatives mean the

28

same thing. The jury was told that it could find against Defendant on the first element of each CSPM claim if it found either that "[D]efendant caused [S.G.] to engage in sexual intercourse," or if "[D]efendant caused the insertion, to any extent, of his penis into the vagina of [S.G.]." Because both of these alternatives mean the same thing, Defendant could not have been prejudiced by the fact that the jury instructions contained both alternatives. *See id.* ¶ 46 (noting that where alternative CSPM instruction was erroneously given, but "convey[ed] the same definition and meaning" as "the instruction that should have been given," the "instruction accurately presented the applicable law," and "any error in the alternate instruction given . . . was not reversible error").

**{44}** Defendant argues that a supplemental instruction should have been given in response to the jury's apparent confusion in this case, as evidenced by the note it sent to the court, and the fact that someone, apparently a juror, wrote the word "No" next to the first alternative in Instruction No. 5. This claim was waived because Defendant never asked for a supplemental instruction to provide the clarification he now contends was necessary, and because he told the district court that he had no objection to its supplemental instruction. *See State v. Boeglin*, 1987-NMSC-002, ¶ 11, 105 N.M. 247, 731 P.2d 943 (holding that failure to object to erroneous jury instructions

29

constituted waiver, but reviewing the issue for fundamental error); *see also State v. Roybal*, 1960-NMSC-012, ¶ 6, 66 N.M. 416, 349 P.2d 332 ("Failure [to object to jury instructions or tender different ones] is a waiver of the right to object in this court.").

## III. Ineffective assistance of counsel

{45} Defendant contends that his trial counsel was ineffective and that he abandoned his role as an advocate for Defendant because he told the voir dire panel that anyone convicted of the forcible rape of a child should be put to death. Defendant further argues, without any record citations, that his trial counsel was ineffective in several other ways, and suggests that these additional claims may be raised in a habeas corpus proceeding. We reject Defendant's claim that his counsel abandoned him and agree that his other ineffective assistance claims should be raised, if at all, in a future habeas corpus proceeding.

{46} The Sixth Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, guarantees a criminal defendant the right to the effective assistance of counsel. *Patterson v. LeMaster*, 2001-NMSC-013, ¶ 16, 130 N.M. 179, 21 P.3d 1032. To establish a prima facie case of ineffective assistance of counsel, Defendant must prove that "(1) counsel's performance fell below that of a reasonably competent attorney; (2) no plausible, rational strategy or tactic explains

30

counsel's conduct; and (3) counsel's apparent failings were prejudicial to the defense." *State v. Cordova*, 2014-NMCA-081, ¶ 9, 331 P.3d 980 (internal quotation marks and citation omitted). In considering an ineffective-assistance claim, we "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *State v. Hunter*, 2006-NMSC-043, ¶ 13, 140 N.M. 406, 143 P.3d 168 (internal quotation marks and citation omitted). A defendant who has been convicted at trial must prove that trial counsel's ineffective performance calls into doubt "the reliability of the trial results." *State v. Jacobs*, 2000-NMSC-026, ¶ 48, 129 N.M. 448, 10 P.3d 127. We review claims of ineffective assistance of counsel de novo. *Duncan v. Kerby*, 1993-NMSC-011, ¶ 7, 115 N.M. 344, 851 P.2d 466.

{47}    Defense counsel's strategy was to focus on the language in the CSPM statute requiring a jury finding that Defendant *caused* S.G. to engage in sexual intercourse, and attempted to persuade the jury that S.G., and not Defendant, had *caused* the sexual intercourse between them to occur. *See* § 30-9-11(A) ("Criminal sexual penetration is the unlawful and intentional *causing* of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse[.]" (emphasis added)). Thus, in his cross-

31

examination of S.G., defense counsel focused on obtaining admissions that S.G. wanted to have sex with Defendant. In his closing, defense counsel argued that the issue in the case was whether Defendant caused S.G. to engage in sexual intercourse and argued that S.G. had caused the sexual intercourse to occur.

{48}     Defense counsel's remarks to the voir dire panel, to which Defendant now objects, were consistent with this defense. During the State's voir dire, several prospective jurors said that they could not be fair in cases involving sexual abuse of a child, and expressed hostility to child abusers. One of them said that men who sexually abuse children should be castrated. During his voir dire, defense counsel said "First of all, I absolutely agree with" the prospective juror "that any man who rapes a child should not just be castrated, but should be given the death penalty, and if I had control of the laws of the State of New Mexico, anyone who raped a child, forcibly raped a child, the death penalty would be on the table as a punishment, and they'd be given one appeal. That's how I feel; that's the truth."

{49}     Defendant now argues that in light of the fact that no one disputed that he had sex with S.G., it was "unconscionable for defense counsel to taint the jury in this way," and that by making this statement, defense counsel "implicitly conceded in graphic terms Mr. Silver's guilt." We disagree. Defense counsel was faced with the

32

unenviable task of defending a case that was virtually impossible to defend. He knew that the jury would hear the recording of an hour-long, articulate statement by his client, confessing in detail to having sex with S.G. on multiple occasions. He knew that S.G. would testify that she and Defendant had frequent sex, and that her little brother, X.C., would testify that he witnessed Defendant having sex with S.G. in a hotel room. Although a minor's consent is not a defense to a CSPM charge, defense counsel attempted to persuade the jury that S.G.'s undisputed consent to sexual relations with Defendant meant that he did not *cause* the sexual relationship.

{50} We consider defense counsel's remarks to the voir dire panel as an attempt to establish credibility with the prospective jurors, and as part of an effort to persuade them that were was a relevant distinction between forcible rape and consensual sex with a minor, although legally there is no such distinction. We do not agree with Defendant's claim this his counsel's conduct fell below that of a reasonably competent attorney, or that no plausible, rational strategy supported his conduct. Moreover, given the overwhelming strength of the State's case against Defendant, and the virtual certainty of a conviction, we are not convinced that defense counsel's conduct prejudiced Defendant. The Constitution required defense counsel to offer effective assistance. It did not require him to work a miracle.

33

{51}     As for Defendant's other claims of ineffective assistance of counsel, Defendant has failed to establish a prima facie case of ineffective assistance, and therefore we reject those claims without prejudice to Defendant's ability to raise those claims in a habeas corpus proceeding. *See State v. Bernal*, 2006-NMSC-050, ¶¶ 33, 36, 140 N.M. 644, 146 P.3d 289 (expressing a general preference for ineffective assistance of counsel claims to be brought and resolved in habeas corpus proceedings, and when a prima facie case is not made on appeal, the claim is rejected without prejudice to a defendant's right to raise the claim in a habeas corpus proceeding).

**CONCLUSION**

{52}     We affirm Defendant's convictions.

{53}     **IT IS SO ORDERED.**

_____
**EMIL J. KIEHNE, Judge**

34

WE CONCUR:

_____

**MICHAEL E. VIGIL, Judge**

_____

**HENRY M. BOHNHOFF, Judge**